(3 P.3d 551)
No. 83,083

BARBARA SHEHANE, *Appellee*, v. STATION CASINO and CNA
INSURANCE COMPANY, *Appellants*.

—

Opinion filed March 24, 2000.

*John David Jurcyk* and *Douglas M. Greenwald,* of McAnany, Van Cleave &
Phillips, P.A., of Kansas City, for the appellants.

*Mark E. Kelley,* of Withers, Brant, Igoe & Mullennix, P.C., of Liberty, Missouri,
for the appellee.

Before BRAZIL, C.J., PIERRON, J., and WAHL, S.J.

PIERRON, J.: In this workers compensation case, Station Casino
(Station) and its insurance carrier, CNA Insurance Co., appeal an
award in favor of Barbara Shehane. Station argues the Kansas
Workers Compensation Act (KWCA) does not provide jurisdiction
over Shehane and that the Board's award is not supported by sub-
stantial competent evidence.

Barbara Shehane is a professional singer/dancer/actor who lives
in Prairie Village, Kansas. In early November 1996, she responded
to an ad in the newspaper for actors to perform at the Station

Casino in Kansas City, Missouri. Shehane auditioned on two separate occasions for Station, both times in an office in Kansas City, Missouri. On November 2, 1996, following the second audition, Rick Hagg, Station's director of casting, called her at home. She was not home and Hagg left a message asking her to call his home in Shawnee, Kansas. Shehane called and obtained further information from Hagg about the pay and other specifics concerning the job. At no time did Hagg tell Shehane that a drug test was required and that if she failed the test, she would not be eligible for the job.

The next day, November 3, 1996, Shehane again called Hagg at his home in Shawnee from her home in Prairie Village. She verbally accepted the job. Again, Hagg made no mention of any drug test being a prerequisite of the hiring process. Shehane was hired to start in November 1996 and to continue until March 1997.

Within a few days, Shehane received a written contract at her home. The contract memorialized the terms of the parties' agreement and had been signed by Station's Director of Entertainment. The contract referenced a "pre-employment drug screening" which was considered a "condition of employment." The contract stated that if Shehane failed to meet the standards set by Station to pass the drug screen, then the "agreement shall be considered canceled and terminated and the offer of employment shall be withdrawn." Shehane signed the contract and returned it to Station. Prior to beginning work with Station, Shehane received a letter indicating she needed to complete a drug screen prior to reporting to work on November 19, 1996. Shehane went to a lab located in Missouri and completed the requested drug screening. She began working at Station on November 19, 1996.

On February 4, 1997, Shehane was walking in an underground tunnel on her way to the employee break room when she slipped and fell, injuring her right elbow and left ankle. She was treated in the emergency room at North Kansas City Hospital. Shehane was referred to Dr. Thomas McCormack for evaluation and treatment. Dr. McCormack treated Shehane for a contusion to her right elbow and a sprain of her left ankle. He provided Shehane with a wooden shoe to protect her foot and ankle and treated her elbow with

physical therapy. She saw Dr. McCormack on four occasions that year concluding with a visit on March 31, 1997.

At the visit on March 31, 1997, Dr. McCormack found Shehane had virtually no ankle complaints, was wearing an ankle stirrup, and had improved dramatically. Shehane complained of mild tenderness in her forearm, but Dr. McCormack stated the condition had significantly improved since the initial examination. Dr. McCormack released Shehane from his care, placed no functional impairment or permanent restrictions upon her, and indicated she could return to work on an as needed basis.

Shehane returned to Dr. McCormack on March 16, 1998, for a follow-up examination. At that time, she displayed minor twinges in her left ankle and extreme tenderness over the lateral epicondyle of her elbow. This was not in the elbow musculature but rather in the lateral epicondyle. The tenderness in the musculature of the elbow which was present at the initial examination was absent during the March 1998 follow-up examination. Dr. McCormack diagnosed Shehane with right lateral epicondylitis, which in his opinion was not the same injury as occurred with the contusion of the elbow. Dr. McCormack believed Shehane's original symptoms from the fall had resolved themselves and she had developed a separate epicondylitis condition which was not present in 1997 and did not result from the accident in 1997.

At the court's request, an independent medical examination was conducted by Dr. Lowry Jones, an orthopedic surgeon. Both parties approved of Dr. Jones. Dr. Jones' evaluation report indicated that he examined Shehane for the purpose of "evaluation and determination of impairment ratings regarding a work-related injury dated February 4, 1997." Following an examination and review of medical records, Dr. Jones gave the opinion that Shehane suffered an inversion injury to her left ankle along with a direct traumatic injury to her right elbow with a positive effusion suggesting moderate to severe soft tissue injury. Dr. Jones recommended additional treatment and rehabilitation for both the ankle and elbow injuries. Dr. Jones rated Shehane at 5% functional impairment for her ankle and 12% to 15% impairment for her elbow.

The administrative law judge (ALJ) found Shehane to be within the jurisdiction of the KWCA. The ALJ found Shehane's employment contract was made within Kansas based on her oral acceptance of the contract at her home in Prairie Village. The ALJ found the drug screen was merely a basis for canceling the contract and was not the last act needed in order to create a contract between the parties.

With regard to Shehane's injuries, the ALJ relied upon Dr. Jones' independent medical exam and concluded that Shehane sustained a 10% body as a whole impairment resulting from the accident in February 4, 1997. Station appealed to the Workers Compensation Board.

The Board affirmed the ALJ's decision. The Board agreed with the ALJ's analysis on jurisdiction and the resulting Award. However, the Board commented further on the admissibility of Dr. Jones' report. Station argued Dr. Jones' report contained a causation opinion which was impermissible. The Board disagreed and found that all indications were that Dr. Jones evaluated Shehane for the work-related accident on February 4, 1997, and nothing more. The Board stated the ALJ had the statutory authority to appoint an independent medical examiner to evaluate a claimant's impairment rating and that was what occurred in this case.

A dissenting Board member disagreed, stating the Board used Dr. Jones' report to support its causation finding rather than simply for a functional impairment rating. The dissent argued Dr. Jones' report should be excluded from the evidence or at the very least limited to a functional impairment opinion, and the medical report of Dr. McCormack, the treating physician, should be adopted regarding causation. The dissent believed Shehane should be denied any permanent award.

Station first argues the Board erred in exercising jurisdiction over Shehane. Station contends the contract was not made in Kansas because the last act for formation of the contract was Shehane's successful completion of the drug screening, *ie.*, it was a condition precedent. Station also argues the Performer Agreement clearly provides that its terms and provisions are governed by Missouri law.

The Board's holding was based on a factual finding that the employment contract was made in Kansas. The issue on appeal, therefore, is whether that finding is supported by substantial competent evidence. *Neumer v. Yellow Freight System, Inc.*, 220 Kan. 607, 556 P.2d 202 (1976). In workers compensation cases, substantial competent evidence is " 'evidence possessing something of substance and relevant consequence, and carrying with it fitness to induce conviction that the award is proper, or furnishing substantial basis of fact from which the issue tendered can be reasonably resolved.' [Citation omitted.]" *Depew v. NCR Engineering & Manufacturing*, 263 Kan. 15, 26, 947 P.2d 1 (1997).

Since the accident in this case occurred in Missouri, the KWCA would apply if the principal place of employment was Kansas or the contract for employment was made in Kansas. K.S.A. 44-506 provides that "the workmen's compensation act shall apply also to injuries sustained outside the state where: (1) The principal place of employment is within the state; or (2) the contract of employment was made within the state, unless such contract otherwise specifically provides."

Section 9 of the Performer Agreement signed by Shehane stated:

"Actor agrees to submit to a pre-employment drug screening and background check as a condition of employment at SCKS [Station]. Should the Actor fail to meet standards deemed acceptable by SCKS, this agreement shall be considered canceled and terminated and the offer of employment shall be withdrawn with no liability whatsoever to SCKS."

The basic principle is that a contract is "made" when and where the last act necessary for its formation is done. *Smith v. McBride & Dehmer Construction Co.*, 216 Kan. 76, 530 P.2d 1222 (1975). When that act is the acceptance of an offer during a telephone conversation, the contract is "made" where the acceptor speaks his or her acceptance. *Morrison v. Hurst Drilling Co.*, 212 Kan. 706, Syl. ¶ 1, 512 P.2d 438 (1973); see Restatement (Second) of Contracts, § 64, Comment c (1974).

The acceptance of the offer of employment occurred during the telephone conference between Shehane and Hagg on November 3, 1996. At the time of acceptance, Shehane was in her home in Prairie Village talking to Hagg at his home in Shawnee. Applying

*Morrison* to the case at bar, the contract was "made" in Kansas where Shehane accepted the job. Additionally, Shehane signed the employment contract at her home in Kansas and sent it back to Station.

However, Station argues the last act necessary for formation of the contract was not the telephone acceptance of the job, but rather successful completion of a drug screen. Station states it is uncontroverted that Shehane was advised by letter before the anticipated date of hire and before her first day of work that she would have to take a drug screen and that the screening would be done in Missouri. Consequently, Station argues completion of the drug test was a condition precedent to the formation of the employment contract.

There does not appear to be Kansas authority on this precise point. *Bowen v. Workers' Comp. Appeals Bd.*, 73 Cal. App. 4th 15, 86 Cal. Rptr. 2d 95 (1999), provides some authority for discussion of this case. There, the court cited the case of *Thompson v. Golden Eagle Ins. Co.* 87 RDG 32124, 18 Cal. Workers' Comp. Rptr. 43 (1990), where the Workers Compensation Appeals Board upheld the workers compensation judge's finding that a contract of hire by a California employer was made in California, thus justifying the WCAB's exercise of jurisdiction over the injury to an Oregon truck driver suffered in Illinois. This was so even though the contract of hire was contingent upon good job references and passing certain tests. The WCAB stated: " 'As to the contingencies that could have precluded applicant from working, such as bad job references or failure to pass any of the tests, these were merely conditions subsequent that did not prevent formation of a contract . . . .' " 73 Cal. App. 4th at 23. The *Bowen* court also found its reliance on *Thompson*, a WCAB panel decision, was permissible as an indication of contemporaneous interpretation and application of workers compensation laws. 73 Cal. App. 4th at 23 n.12.

As cited by the court in *Bowen*, the practice manual St. Clair, Cal. Workers' Compensation Law & Practice, § 2.10, pp. 111-12 (5th ed. 1996), states:

" '[T]he fact that there are formalities which must be subsequently attended to with respect to such extraterritorial employment does not abrogate the contract

of hire or California jurisdiction. Such things as filling out formal papers regarding the specific terms of the employment or obtaining a security clearance from the federal government are deemed 'conditions subsequent' to the contract, not preventing it from initially coming into existence.' [Citations.]" 73 Cal. App. 4th at 22.

The formation or creation of the contract in this case was complete when Shehane accepted the offer of employment on the telephone and further when she signed the employment contract, both events occurring at her home in Prairie Village. We agree with the Board that § 9 of the Performer Agreement indicates that a contract was in existence at the time of the drug screening and that failure to pass the drug screening would cause the agreement to be "considered canceled and terminated and the offer of employment shall be withdrawn with no liability whatsoever to SCKS." The drug screening was a condition subsequent to the contract and did not prevent it from initially coming into existence.

We also find that Shehane's workers compensation claim is not controlled by Missouri law as the result of a generic choice of law provision in the Performer Agreement. K.S.A. 44-506 provides that the KWAC applies where the contract of employment was made within Kansas "unless such contract otherwise *specifically* provides." (Emphasis added.) The Performer Agreement does not *specifically* provide that Missouri law would control any *workers compensation* claims alleged by Shehane. "The Kansas Workers Compensation Act (the Act), K.S.A. 44-501 *et seq.*, is to be liberally construed for the purpose of bringing employers and employees within the provisions of the Act to provide the protection of the Act to both. The Act is to be applied impartially to both employers and employees. K.S.A. 44-501(g)." *Chapman v. Beech Aircraft Corp.*, 258 Kan. 653, 655, 907 P.2d 828 (1995). Consequently, we do not find the Performer Agreement controls any claim of workers compensation.

We agree with the Board's decision that Shehane was subject to the KWCA.

Next, Station argues there is not substantial competent evidence to support the Board's finding of permanent partial impairment caused by the workplace accident. Station also argues the Board

erred in relying on the written report of the independent medical examiner.

Again, our standard of review is to determine whether the Board's award is supported by substantial evidence. See *Miner v. M. Bruenger & Co.*, 17 Kan. App. 2d 185, 188, 836 P.2d 19 (1992).

Station argues the only sworn medical testimony presented in the case was that of Dr. McCormack, Shehane's treating physician, who testified that Shehane had sustained no permanent partial impairment and no permanent physical restrictions as a result of the accident on February 4, 1997. Station argues the Board's reliance on the independent medical evaluation by Dr. Jones to support its award was erroneous because (1) Dr. Jones never attributed Shehane's injuries to the accident on February 4, 1997, and (2) Dr. Jones did not give *permanent* ratings because he did not believe that Shehane had reached her maximum medical improvement.

The court in *McKinney v. General Motors Corp.*, 22 Kan. App. 2d 768, 921 P.2d 257 (1996), cited K.S.A. 44-523 and *Box v. Cessna Aircraft Co.*, 236 Kan. 237, 243-44, 689 P.2d 871 (1984), for the proposition that the ALJ and the Board are not bound by technical rules of procedure and are to give the parties a reasonable opportunity to be heard and present evidence. In pointing out that medical evidence is not essential to the establishment of the existence, nature, and extent of an injured worker's disability, pursuant to *Chinn v. Gay & Taylor, Inc.*, 219 Kan. 196, 201, 547 P.2d 751 (1976), the *McKinney* opinion held:

"The policy, structure, and intent behind the Act supports construing K.S.A. 44-510e(a) and K.S.A. 44-519 to allow the neutral medical report to be admitted into evidence without requiring supportive testimony. Under an integrated interpretation of K.S.A. 44-510e(a) and K.S.A. 44-519, the absence of testimony supporting the report does not make it inadmissible. GM's interpretation of these statutes, after deciding not to cross-examine Dr. Hood, is the equivalent of inviting error." 22 Kan. App. 2d at 772.

The ruling in *McKinney* was limited by this court's decision in *Sims v. Frito-Lay, Inc.*, 23 Kan. App. 2d 591, 933 P.2d 161 (1997). In the latter, the court considered the issue of whether an ALJ could consider that portion of an independent medical examiner's report going beyond an evaluation of functional impairment where

there was no supporting testimony by the independent medical examiner. The *Sims* court said no. 23 Kan. App. 2d at 593-94.

The *Sims* court recognized the precedent set by *McKinney* that the ALJ could consider the report of an independent health care provider regarding a claimant's *functional impairment* without the health care provider's supporting testimony. The *Sims* court clarified "[T]he plain language of K.S.A. 44-510e(a) does not allow an administrative law judge to routinely consider an independent health care provider's opinion on issues beyond that of functional impairment without supporting testimony." 23 Kan. App. 2d at 593.

However, the *Sims* court went on to say:

"Like the Board, we express no opinion as to whether the administrative law judge, pursuant to K.S.A. 44-510e(a), may specifically request an independent health care provider to state an opinion on matters beyond functional impairment and consider that opinion without the supporting testimony of the independent health care provider." 23 Kan. App. 2d at 593.

At oral argument we were interested to find out that the common practice in the presentation of workers compensation cases is to skip lightly over some procedural requirements. For instance, if it appears there will be substantially different opinions concerning percentages of functional impairment presented by the physicians for both sides, this fact is communicated to the ALJ. The ALJ may often use the provisions of K.S.A. 44-510e to appoint an independent health care provider to contribute an opinion.

Since the independent opinion is usually given great weight by the ALJ, the opinions of the parties' doctors may not be taken by deposition or otherwise formally entered into the record to save on costs. Courts reviewing the independent opinion must then rely on the assumption that there were two differing medical opinions to trigger the appointment of the independent health care provider.

In the instant case, neither side addressed the issue of whether, as noted above in *Sims*, the ALJ, pursuant to K.S.A. 44-510e(a), specifically requested an opinion from the health care provider on matters beyond functional impairment and how the Board might view that procedure.

Since this case went to hearing well after *Sims* was decided, we would have some reason to believe that the issue could have been addressed. However, in discussing the appropriateness of considering the opinion of the independent health care provider, neither the Board majority nor the dissent cite *Sims*.

Resolution of this issue would require factual speculation on our part. We therefore remand this matter for specific findings by the Board on the issues raised in *Sims*, namely whether the ALJ requested a specific opinion on causality and whether the Board believes such a statutory interpretation is correct. Deference is given to administrative agency interpretation of the statutes they are to enforce.

Based on the record in this case, if the Board finds the independent expert may opine concerning causality, and such a request was made, there obviously is sufficient evidence to support the Board's conclusion on causality.

Affirmed and part and remanded for proceedings consistent with this opinion.