(128 P.3d 984)
No. 94,588

BRADLEY SPEER, *Appellant,* v. SAMMONS TRUCKING and FIREMAN'S FUND INSURANCE COMPANY, *Appellees.*

Opinion filed February 24, 2006.

*Shayla C. Johnston*, of The Johnston Law Offices, P.A., of Wichita, for appellant.

*Terry J. Torline*, of Martin, Pringle, Oliver, Wallace & Bauer, L.L.P., of Wichita, for appellees.

Before GREEN, P.J., MCANANY, J., and BRAZIL, S.J.

GREEN, J.: Bradley Speer appeals from the decision of the Workers Compensation Board (Board) where the Board found that it lacked jurisdiction under K.S.A. 44-506 to consider Speer's claim because Speer failed to show (1) that his principal place of employment was within Kansas or (2) that his contract of employment was made within Kansas. To receive benefits under the Kansas Workers Compensation Act (Act), K.S.A. 44-501 *et seq.*, K.S.A. 44-506 requires that a claimant meet one of the above requirements.

On appeal, Speer has failed to establish that the Board disregarded undisputed evidence or was motivated by bias, passion, or prejudice when it found that he had failed to show that his principal place of employment was within Kansas. Moreover, there is substantial competent evidence in the record to support the Board's finding that Speer's contract of employment was not made in Kansas. Finding no reversible error, we affirm.

Speer began working as a truck driver for Bob Wilbur in 1995 when Wilbur contacted him at his home about taking a load to

Portland, Oregon. Wilbur was the owner and operator of a semi-truck which was leased to Sammons Trucking (Sammons) to haul goods and materials. Sammons has no offices in Kansas, and its main office is located in Missoula, Montana.

When Speer first went to work for Wilbur, he was not authorized by Sammons to drive Wilbur's truck. In fact, when Speer agreed to drive Wilbur's truck to Oregon, Speer had a class A driver's license but did not have the required Department of Transportation physical qualifications card. Wilbur paid Speer directly for his services.

Nevertheless, Speer indicated that he became authorized to haul goods and materials for Sammons approximately 2 months after he began driving Wilbur's truck. Wilbur first contacted Sammons about authorizing Speer to drive his truck. Sammons mailed an application to Speer's home in Wichita. Speer completed and returned the application to Sammons and also provided driving history and other requested verification information to Sammons. Speer indicated that a representative of Sammons named Otis handled his verification requirements. Otis advised Speer that he needed to come to Sammons' office in Houston, Texas, to go through orientation and to be cleared to drive for Sammons. Speer then traveled to Houston, where he underwent orientation, drug screening, and driver certification for Sammons.

According to Speer, he later became authorized to haul goods and materials for Sammons after he traveled to Houston and passed the drug test and the road test and completed the orientation requirements. Upon completing Sammons' requirements in Texas, Speer continued to drive Wilbur's truck and was paid by Wilbur. Speer indicated that he dealt with Sammons on a daily basis as they gave him information concerning the pick-up and drop-off locations for loads.

Wilbur died in 1997 or 1998, and Wilbur's family took possession of the truck. Speer indicated that he did not work until approximately 3 months later, when he began driving a company truck for Sammons. According to Speer, he contacted Sammons by telephone from his home in Wichita and asked if he still had a job. Speer spoke with Sammons' representative Kathy Smith, who told

him that they liked his work and that he still had a job with them. Speer told Smith, however, that he was not going to work under the same conditions that he had previously been working.

Specifically, Speer told Smith that he needed a company truck, benefits, higher pay, and seniority credit. Smith indicated that she would have to speak with Otis, who could authorize or deny those things. Both Smith and Speer spoke with Otis at different times. Otis agreed to Speer's conditions of employment and said that he would credit Speer with half seniority time. At the time of their conversations, Otis and Smith were in Montana and Speer was in Wichita.

Speer was required to travel to Montana to pick up a company truck and to go through orientation. Speer picked up a bus ticket, which Sammons had purchased for him, at the bus station in Wichita and traveled to Montana where he completed orientation; signed paperwork, including an agreement which outlined the company bylaws; took a drug test; and picked up his company truck. Speer admitted that he would not have been hired had he failed the drug test.

Speer drove a company truck for Sammons for the next several years, spending long stretches of time traveling throughout the United States. Speer indicated that it was very difficult for him to get back home to Wichita and that he was only home for approximately 30 days a year. Sammons would credit Speer's fuel card with the amount of his compensation and then send any information to Speer's brother's house.

In November 2002, Speer filed a workers compensation claim against Sammons. Speer alleged that he sustained injuries to his back, left arm, and left shoulder when he was tying down a load in downtown San Francisco in November 2001 and was struck from behind by the mirror of a pickup truck. Speer filed another workers compensation claim against Sammons in December 2002. In his second claim, Speer asserted that he sustained injuries to his back, left arm, and left shoulder on three separate dates in 2002 while in Texas, Arizona, and Colorado.

After his September 2002 injury, Speer made arrangements with Sammons so that he could return to Wichita to see his doctor.

Speer's doctor then placed Speer on work restrictions. Sammons notified Speer that he was not allowed to drive for them with the work restrictions and that he would need a doctor's release before returning to work. Speer did not work for Sammons after September 2002.

One of the issues before the administrative law judge (ALJ) presiding over Speer's case was whether the parties were covered by the Act. Sammons argued that Kansas lacked jurisdiction over Speer's claims under K.S.A. 44-506 because the accidents occurred outside of Kansas, because Sammons' principal place of business was in Montana, and because the contract of employment was made outside of Kansas.

The ALJ determined that the parties were subject to the Act because Speer's contract of employment with Sammons occurred while Speer was in Wichita. Finding that Speer suffered a 65.5 percent permanent partial disability, the ALJ awarded Speer compensation for his injuries. Sammons appealed the ALJ's decision to the Board. The Board reversed the ALJ's award of compensation, finding that Speer's employment contract was not made within Kansas because the last act necessary for the contract's formation was the acceptance by Sammons' representative in Montana. Moreover, the Board found that Speer had failed to prove that his principal place of employment was within Kansas. Because Speer was not subject to the Act under K.S.A. 44-506, the Board determined that it lacked jurisdiction to consider Speer's claims.

*Standards of Review*

Whether jurisdiction exists is a question of law over which this court's scope of review is unlimited. *Abbey v. Cleveland Inspection Services, Inc.*, 30 Kan. App. 2d 114, 116, 41 P.3d 297 (2002). The question of jurisdiction in this case is governed by K.S.A. 44-506 which states:

"The workmen's compensation act shall not be construed to apply to business or employment which, according to law, is so engaged in interstate commerce as to be not subject to the legislative power of the state, nor to persons injured while they are so engaged: *Provided,* That the workmen's compensation act shall apply also to injuries sustained outside the state where: (1) The principal place of em-

ployment is within the state; or (2) the contract of employment was made within the state, unless such contract otherwise specifically provides."

In this case, Speer challenges the Board's findings relating to subsections (1) and (2) of K.S.A. 44-506. In addressing Speer's arguments, we must bear in mind that a claimant has the burden of proof to establish the right to a compensation award by proving the conditions on which the right depends by a preponderance of credible evidence. *Knelson v. Meadowlanders, Inc.*, 11 Kan. App. 2d 696, 699, 732 P.2d 808 (1987).

Moreover, we recognize that the Act " 'shall be liberally construed for the purpose of bringing employers and employees within the provisions of the act to provide the protections of the workers compensation act to both. The provisions of the workers compensation act shall be applied impartially to both employers and employees in cases arising thereunder.' K.S.A. 44-501(g)." *Neal v. Hy-Vee, Inc.*, 277 Kan. 1, 14, 81 P.3d 425 (2003).

*Was the principal place of employment in Kansas?*

First, Speer argues that Kansas has jurisdiction over his claims under K.S.A. 44-506(1) because his principal place of employment was in Kansas. The Board found that Speer had not met this requirement of K.S.A. 44-506 because he had not proven that his principal place of employment was within Kansas. The Board's determination that a party did not meet his or her burden of proof is a negative finding. Our standard of review is to determine whether that finding is supported by the evidence as a whole. The party challenging a negative finding must prove arbitrary disregard of undisputed evidence or some extrinsic consideration such as bias, passion, or prejudice. *Nance v. Harvey County*, 263 Kan. 542, 551, 952 P.2d 411 (1997).

In arguing that his principal place of employment was within Kansas, Speer cites to this court's decision in *Knelson*, 11 Kan. App. 2d 696. There, Knelson was a professional hockey player under contract to Meadowlanders, Inc., the corporate owner of the New Jersey Devils professional hockey team. Knelson was injured during a hockey game in Utah while he was playing for the Wichita Wind minor league hockey club. Knelson's base of operations was

in Wichita, he traveled from Wichita to play the hockey game in Utah, and he received his paychecks in Wichita. This court determined that the evidence supported the trial court's conclusion that the Act applied to Knelson's injury because his principal place of employment was within Kansas under K.S.A. 44-506(1). 11 Kan. App. 2d at 698-99.

Here, the Board discussed the *Knelson* case but found it to be distinguishable from the facts of the instant case, stating:

"In this instance, *Knelson* is distinguishable. This claimant, while living in Wichita, Kansas, spent very little time in Wichita, Kansas. His base of operation was either Houston, Texas, or Missoula, Montana, the locations of respondent's dispatch centers. Claimant acknowledged he was rarely in Kansas and had to make special arrangements in order to get back to Wichita in order to see his doctors for his injuries, including his neurosurgeon. The Board finds that in this instance, as claimant has not proven that his principal place of employment was within the state of Kansas, he does not meet that requirement of K.S.A. 44-506."

We agree that *Knelson* is factually distinguishable. Nevertheless, Speer argues that based upon *Knelson*, it would seem that Wichita was more of a base of operations for him than it was for Knelson. Speer identifies the following eight factors which he argues establish that his principal place of employment was within Kansas: (1) He resided in Kansas; (2) he was sent by Sammons to obtain medical care in Kansas; (3) he was originally recruited to work for Sammons by Wilbur in Kansas; (4) Wilbur's business and truck were based in Kansas; (5) he had been a licensed truck driver since 1972 in Kansas; (6) he received health insurance benefits from Sammons in Kansas; (7) Sammons mailed his application for safety clearance to Kansas; and (8) Sammons purchased the bus ticket for him in Kansas.

Several of these factors relate to Speer's initial employment with Wilbur and are not relevant in determining whether Speer's principal place of employment with Sammons was in Kansas. The evidence in this case indicates that Speer was employed by Wilbur when he drove Wilbur's truck. Wilbur was the owner and operator of the truck which he leased to Sammons. Wilbur hired Speer to be the driver of his truck and was the one who paid Speer. After Wilbur died, Speer did not work for 3 months. He then entered

into an employment contract with Sammons that included a company truck, benefits, and seniority credit. Although Speer indicated that he was rehired by Sammons at that time, he also admitted that this was a new deal between he and Sammons.

Regardless of whether Sammons could be seen as Speer's employer at the time Speer drove Wilbur's truck, Speer entered into a new employment contract with Sammons after Wilbur died. The evidence indicates that Speer was injured when he was working for Sammons under the new employment contract. Therefore, we must analyze whether Speer's principal place of employment was in Kansas under this employment contract.

Unlike the facts in *Knelson*, Speer's base of operations was not in Kansas. Speer, after becoming an employee of Sammons, was seldom ever in Kansas—so far as the record shows—except for short stays. As the Board stated in its decision, his base of operations was in either Texas or Montana, where Sammons had its dispatch centers. Speer's own testimony indicated that Sammons did not have any offices in Kansas. When Speer was hired by Sammons, he had to take a bus to Montana to pick up the truck he would be driving for the company. He then spent long stretches traveling throughout the United States without returning to his home in Wichita. Speer only returned to his home for approximately 30 days a year which did not occur all at the same time. Sammons would credit Speer's fuel card with the amount of his compensation. Sammons would send a pay stub to the home of Speer's brother. When Speer was injured and needed to see his doctor in Wichita, Speer had to make special arrangements with Sammons so that he could be routed back to Wichita. These facts indicate that Speer's principal place of employment was not in Kansas.

As pointed out by Sammons, the factors referenced by Speer were listed in Speer's letter to the ALJ, were included in Speer's brief to the Board, and were pointed out to the Board during oral argument. Moreover, the Board discussed these factors in its written decision. The Board obviously considered these factors when making its findings that Speer's principal place of employment was not within Kansas. We cannot say that the Board disregarded these

factors when it found that Speer had not met his burden to show that his principal place of employment was within Kansas. Moreover, Speer has failed to show that the Board disregarded undisputed evidence or was motivated by bias, passion, or prejudice when it made this finding. As a result, Speer's argument fails.

*Was the employment contract made within Kansas?*

Finally, Speer argues that the Board erred in finding that his contract of employment was not made within Kansas. An appellate court's review of questions of fact in a workers compensation case is limited to whether the Board's findings of fact are supported by substantial competent evidence which is a question of law. *Titterington v. Brooke Insurance*, 277 Kan. 888, 894, 89 P.3d 643 (2004). Substantial evidence in workers compensation cases is evidence that possesses something of substance and relevant consequence and carries with it fitness to induce the conclusion that the award is proper, or furnishes a substantial basis of fact from which the issue raised can be reasonably resolved. The appellate court reviews the evidence in the light most favorable to the prevailing party and does not reweigh the evidence or assess the credibility of the witnesses. *Neal*, 277 Kan. at 16-17.

In arguing that his contract of employment was made within Kansas, Speer asserts that he was continuously employed by Sammons beginning in 1995 after he accepted employment in Wichita. As in the previous issue, Speer attempts to bootstrap his employment when he drove Wilbur's truck into his later employment contract that occurred in 1997 or 1998 with Sammons. Nevertheless, as discussed above, a new employment contract was formed between Speer and Sammons after Wilbur died. This new employment contract was the one in existence when Speer was injured. Therefore, the Board properly looked to this last employment contract when determining whether Speer's contract of employment was made in Kansas.

Speer contends that regardless of whether his employment relationship with Sammons began before or after Wilbur's death, there was uncontroverted testimony that his employment with Sammons was entered into at his Wichita home. The relevant in-

quiry under K.S.A. 44-506(2) is whether Speer's employment contract was made within Kansas. "[A] contract is 'made' when and where the last act necessary for its formation is done. [Citation omitted.] When that act is the acceptance of an offer during a telephone conversation, the contract is 'made' where the acceptor speaks his or her acceptance. [Citations omitted.]" *Shehane v. Station Casino*, 27 Kan. App. 2d 257, 261, 3 P.3d 551 (2000).

In finding that the contract of employment was not made within Kansas, the Board in this case stated:

> "As noted above, during a telephone conversation, the act of the acceptance of an offer is the last act necessary for the contract to be formulated. In this instance, while claimant may have been employed by respondent after the Houston contact, it is obvious that claimant was no longer employed by them after the death of Mr. Wilbur. Claimant then contacted Missoula with the desire to become reemployed. Claimant acknowledged that after undergoing the successful completion of his test in Missoula, he was rehired. And while the contact between claimant and the Missoula, Montana, office occurred while claimant was in Wichita, Kansas, the Board notes the last act necessary for the formulation of the contract was the acceptance by respondent's representative, Otis, of the terms presented to Sammons by claimant. Therefore, the last act necessary to formulate the contract occurred in Missoula, Montana, with the acceptance of claimant's proposals. The Board finds that it does not have jurisdiction to consider this matter pursuant to K.S.A. 44-506, as the contract of employment was not made within this state."

The record on appeal contains substantial competent evidence to support the Board's findings. Speer's testimony in his deposition established that after Wilbur died and Wilbur's family took the truck, he was not working for approximately 3 months. He spoke with Smith and offered to work for Sammons as long as Sammons would give him a company truck, benefits, and seniority credit. At Speer's deposition, the following dialogue took place between Sammons' counsel and Speer:

"Q. [Sammons:] So this is a new deal?
"A. [Speer:] Yes.
"Q. You are telling this at that time to Kathy, there is a new deal here, this is not like it was before, this is a new deal.
"A. Right.
"Q. And if you hire me on you must hire me on these conditions. Company truck, benefits, and I want you to go back and get my seniority so that I get some credit for the time I spent in association with Sammons. Is that true?

"A. Yes."

Speer indicated that Smith had to talk to Otis to see whether his offer would be accepted. According to Speer, both he and Smith talked to Otis at different intervals. Indicating that Otis accepted his offer of employment, Speer further testified at his deposition:

"A. Otis said no problem. He would go ahead and credit with me half of the time I had been with Sammons, authorized with Bob to drive he would give me half of that with credit and seniority.

. . . .

"Q. Otis accepted your offer with the conditions you placed on it?
"A. Yes."

Both Otis and Smith were in Montana at the time Otis accepted Speer's offer of employment.

Speer's testimony established that when he contacted Smith, he made an offer to work for Sammons with certain conditions of employment. Sammons accepted this offer through Otis while Otis was in Montana. Speer's testimony establishes that the last act necessary for the formation of the employment contract, that is, Sammons' acceptance of his offer of employment, occurred in Montana. Speer's testimony provides substantial competent evidence that his employment contract with Sammons was made in Montana.

Nevertheless, Speer argues that Sammons actually responded to his offer with a counteroffer which he then accepted while he was in Wichita. To support his argument, Speer points to testimony given by him at his deposition where he indicated that Sammons offered to give him half seniority for the time he worked with Wilbur and full seniority in the future. This testimony appears to conflict with that given later in his deposition establishing that Sammons responded by accepting his offer. As we set forth in our standard of review on this issue, however, we do not reweigh the evidence. See *Neal*, 277 Kan. at 16-17. Moreover, we uphold findings that are supported by substantial competent evidence even though evidence in the record may support contrary findings. *Stutzman v. City of Lenexa*, 33 Kan. App. 2d 160, 162, 99 P.3d 145 (2004), *rev. denied* 279 Kan. 1010 (2005).

Even if we assume *arguendo* that Sammons made a counteroffer to Speer during the telephone conversation, Sammons asserts that "the last act necessary to consummate the employment agreement was for [Speer] to travel to Montana and successfully pass the drug test and orientation." After Speer's phone conversation with Sammons, he went to Montana where he signed papers, took a drug test, went through the rest of the orientation to be a company driver, and picked up his company truck. Speer's testimony indicated that he would not have been hired if he had failed the drug test in Montana. Speer further indicated that passing the drug test in Montana was a condition that he had to pass before he would be hired. Speer's own testimony indicates that he did not have a job with Sammons until he passed the drug test.

Nevertheless, Speer asserts that the fact that he had to travel outside of Kansas to complete paperwork and tests is irrelevant to the determination of the onset of his employment with Sammons and cites *Shehane*, 27 Kan. App. 2d 257. In *Shehane*, Shehane lived in Kansas and auditioned for an acting job at the Station Casino (Station) in Missouri. While at her Kansas home, Shehane verbally accepted a job during a telephone conversation with the Station's director of casting who was also at his home in Kansas. The director of casting did not tell Shehane that drug testing was a prerequisite of the hiring process. Shehane's job was to begin in November 1996 and was to continue until March 1997. Shehane received a written contract at her home. The contract set forth the terms of the parties' agreement and referenced a "pre-employment drug screening" as a "condition of employment." The contract stated that if Shehane did not pass the drug screen, then the " 'agreement shall be considered canceled and terminated and the offer of employment shall be withdrawn.' " 27 Kan. App. 2d at 258. Shehane signed and returned the contract. Before reporting to work at Station, Shehane completed the requested drug screening at a lab in Missouri.

Shehane subsequently became injured and filed a workers compensation claim under the Act. Determining that Shehane was within the jurisdiction of the Act, the ALJ found that Shehane's employment contract was made within Kansas because she orally

accepted the contract at her home in Kansas. The ALJ found that the drug screen was merely a basis for canceling the contract and was not the last act needed in order to create a contract between the parties. The Board agreed with the ALJ's analysis on this issue.

On appeal to this court, Station argued that the last act necessary for formation of the contract was the successful completion of a drug screen which occurred in Missouri. Station contended that completion of the drug screen was a condition precedent to the formation of the contract. In rejecting Station's argument, this court cited *Bowen v. Workers' Comp. Appeals Bd.*, 73 Cal. App. 4th 15, 22, 86 Cal. Rptr. 2d 95 (1999), where the court quoted from St. Clair, Cal. Workers' Compensation Law & Practice, § 2.10, pp. 111-12 (5th ed. 1996), as follows:

" ' "[T]he fact that there are formalities which must be subsequently attended to with respect to such extraterritorial employment does not abrogate the contract of hire or California jurisdiction. Such things as filling out formal papers regarding the specific terms of employment or obtaining a security clearance from the federal government are deemed 'conditions subsequent' to the contract, not preventing it from initially coming into existence." [Citations omitted.]' " 27 Kan. App. 2d at 262-63.

This court determined that Shehane's employment contract was formed when she orally accepted the offer over the telephone and further when she signed the written contract at her home in Kansas. This court then looked at the language of the contract indicating that a contract was in existence at the time of the drug screening and determined that the drug screening was a condition subsequent to the contract. 27 Kan. App. 2d at 263.

Different from the facts of *Shehane*, there is no written contract here indicating that the drug test, orientation, and other required paperwork were conditions subsequent to Speer's employment with Sammons. Moreover, it is apparent that Sammons would not have given Speer the keys to one of its trucks unless Speer had first satisfied these conditions. Speer admitted in his deposition testimony that passing the drug test was a condition that he had to meet before he would be hired. One might characterize Sammons' offer to Speer as follows: Sammons says to Speer, "Speer, if you will take and pass a drug test, complete orientation, fill out and

sign required paperwork, Sammons will hire you." The taking and passing of the drug test and completing the other conditions must exist as a fact before there is any liability on Sammons to hire Speer. This was a condition precedent rather than a condition subsequent. Black's Law Dictionary 312 (8th ed. 2004) defines a condition precedent as "[a]n act or event, other than a lapse of time, that must exist or occur before a duty to perform something promised arises." Even if Sammons' representative Otis communicated a counter-offer to Speer during the telephone conversations, this counter-offer had conditions precedent that were not fulfilled until Speer completed the drug test, orientation, and paperwork while he was in Montana.

In summary, the satisfaction of these conditions was a prerequisite to the employment contract coming into existence.

Affirmed.