Debra PARSON and Harold Parson, Appellants,

v.

PROCTER & GAMBLE MANUFACTURING CO., Appellee.

Pamela C. USHER and Marshall Dean Usher, Appellants,

v.

PROCTER & GAMBLE MANUFACTURING CO., Appellee.

No. 92–797.

Supreme Court of Iowa.

April 20, 1994.

Rehearing Denied May 25, 1994.

Gregory T. Racette and Anne L. Clark of Hopkins & Huebner, P.C., Des Moines, for appellants.

Charles T. Traw of Leff, Haupert & Traw, Iowa City, for appellee.

McGIVERIN, Chief Justice.

The basic question here is whether, as a matter of law, the employees of a labor broker may be deemed the employees of the broker's industrial customer. Under this record, we believe not.

Accordingly, we vacate the decision of the court of appeals and reverse the judgment of the district court.

I. *Background facts and proceedings.* Kelly Temporary Services (Kelly) is a firm engaged in providing temporary workers to commercial and industrial customers. Defendant Procter & Gamble (P & G) is a Kelly customer; Kelly furnished workers, including plaintiffs, Debra Parson and Pamela Usher, to serve as temporary workers at P & G's plant in Iowa City, Iowa.

Under the written agreement between P & G and Kelly, P & G pays Kelly an agreed hourly rate for the furnished workers. From these payments Kelly pays the workers' wages, payroll expenses, and taxes, plus a workers' compensation insurance premium. Kelly conducts police checks, drug tests, and reference checks on each employee.

At the P & G plant, Kelly's on-site coordinator checks Kelly workers in and out of the plant, assigns them to the production lines, maintains attendance records, and receives complaints. P & G trains the Kelly workers and supervises the hands-on operation of each production line. P & G provides all equipment and establishes safety rules and quality guidelines. P & G cannot terminate the employment of a Kelly worker but can request reassignment.

When compared with P & G's regular employees, the Kelly workers have a much less desirable job. They are paid less. Kelly workers are required to use separate break rooms, entrances, driveways, parking places, and gates. They wear badges that differ from those of full-time P & G employees and are not allowed in the cafeteria or locker room.

While working on the job there, plaintiffs Parson and Usher were injured and received workers' compensation benefits from Kelly's insurer.

Plaintiffs and their spouses (for loss of consortium) later brought this tort suit against P & G based on the same injuries.

Defendant P & G filed a motion for summary judgment, contending that plaintiffs Debra Parson and Pamela Usher were its

employees and that Iowa Code section 85.20 (1991) barred plaintiffs' tort suit against it.

The plaintiffs appealed after the district court, relying largely on *Jones v. Sheller-Globe Corp.*, 487 N.W.2d 88, 93 (Iowa App. 1992), granted summary judgment for defendant P & G as to plaintiffs' claims. The matter is before us on further review of a court of appeals decision affirming the district court ruling.

The nature of the relationship between plaintiffs and P & G controls the appeal. If, as a matter of law, P & G is plaintiffs' employer, tort recovery is barred by the exclusive workers' compensation remedy provision of Iowa Code section 85.20. But if a genuine issue of fact exists as to whether plaintiffs remained employed only by Kelly, and were not employed by P & G, summary judgment for P & G should not have been granted. *See* Iowa R.Civ.P. 237(c).

■ Therefore, our review of the district court's summary judgment ruling is at law. Iowa R.App.P. 4. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Iowa R.Civ.P. 237(c); *Farm Bureau Mut. Ins. Co. v. Milne*, 424 N.W.2d 422, 423 (Iowa 1988). The moving party (P & G) has the burden to show the nonexistence of a material fact. *Milne*, 424 N.W.2d at 423. Evidence must be viewed in the light most favorable to the resisting party. *Thorp Credit, Inc. v. Gott*, 387 N.W.2d 342, 343 (Iowa 1986).

The summary judgment record here consisted of the pleadings, depositions, exhibits, and affidavits.

II. *Contract of hire as a question of disputed fact.* Plaintiffs first contend that the district court erred in holding that there was no genuine issue of material fact as to the existence of an employment relationship between them and P & G. We agree with plaintiffs.

To determine whether an employer falls under the workers' compensation scheme, there must be

a mutual arrangement between the employer and employee under which both give up and gain certain things. Since the rights to be adjusted are reciprocal rights between employer and employee, it is not only logical but mandatory to resort to the agreement between them to discover their relationship. To thrust upon a worker an employee status to which he has never consented ... might well deprive him of valuable rights under the compensation act, notably the right to sue his own employer for common-law damages. This reasoning applies not only to the question whether there is any employment relationship at all, but also to the question whether one of two or more persons is an employer. In such cases, with all the elements of employment having been established as to *some* employer, the issue may be solely whether the particular defendant made a contract with the particular employee.

*Rouse v. State*, 369 N.W.2d 811, 814 (Iowa 1985) (quoting 1B Arthur Larson, *The Law of Workmen's Compensation* § 47.10, at 8–304 to 8–309 (1993) (citations omitted) [hereinafter Larson] ).

■ Thus, the threshold determination in deciding whether a worker falls into the workers' compensation scheme is whether the worker entered into a contract of hire, express or implied. 1B Larson § 47.00, at 8–301; *id.* § 48.00(a), at 8–434; *see* Iowa Code § 85.61(11) (" 'Worker' or 'employee' means a person who has entered into the employment of, or works under contract of service, express or implied, or apprenticeship, for an employer...."); *Muscatine City Water Works v. Duge*, 232 Iowa 1076, 1084, 7 N.W.2d 203, 208 (1942) ("[U]nder our law the employment or work must be under a contract of service, express or implied.").

■ The question of whether a contract of hire exists is ordinarily one of fact. *Polk County v. Steinbach*, 374 N.W.2d 250, 252 (Iowa 1985); *accord Williams v. Delta Truck Body Co.*, 892 F.2d 327, 328 (3d Cir.1989); *French v. Grove Mfg. Co.*, 656 F.2d 295, 299–300 (8th Cir.1981); *Gigax v. Ralston Purina Co.*, 136 Cal.App.3d 591, 598–99, 186 Cal. Rptr. 395, 399 (1982) ("The question of

whether a worker is an employee within the meaning of the Compensation Act .... becomes a question of law only when but one inference can reasonably be drawn from the facts."); *Smith v. Greg's Crane Serv. Inc.,* 576 So.2d 814, 818 (Fla.App.1991); *Saldana v. Wirtz Cartage Co.,* 74 Ill.2d 379, 24 Ill.Dec. 523, 528, 385 N.E.2d 664, 669 (1978); *Mackall v. Zayre Corp.,* 293 Md. 221, 443 A.2d 98, 103 (1982); *Weme v. Lastavica,* 458 N.W.2d 404, 406 (Minn.1990); *O'Brien v. Garden Way Mfg., Inc.,* 72 A.D.2d 860, 860, 421 N.Y.S.2d 729, 730 (1979); *Novenson v. Spokane Culvert & Fabricating Co.,* 91 Wash.2d 550, 588 P.2d 1174, 1177 (1979) ("Consent to an employment agreement with [the defendant] should not be imputed to [the plaintiff] as a matter of law; material factual questions exist regarding the plaintiff's consent to enter a contract of hire."). This rule merely reflects the general rule of contract law that "[t]he determination of the intent of the parties to make a contract, as gathered from what they did and said, is normally a question of fact for the jury, particularly where the terms of the contract are unclear." 75A Am.Jur.2d *Trial* § 795, at 403 (1991) (footnotes omitted). Because the determination of the employment status of a workers' compensation claimant by the Industrial Commissioner is one of fact, *see Steinbach,* 374 N.W.2d at 252, we do not see why a similar determination by the district court becomes one of law.

■ Moreover, in cases involving the question of whether an employee of a general employer became the employee of a special employer, the presumption is that the general employer continues as the sole employer. *O'Brien,* 72 A.D.2d at 860, 421 N.Y.S.2d at 730; 1B Larson § 48.14, at 8–455.

Because in many cases an express contract will not exist, courts look for evidence of the employee's consent to an employment relationship with the alleged special employer. This is especially true when an employee stands to lose the right to sue the special employer in tort; as Larson notes, "when the question has been presented in this form, the courts have usually been vigilant in insisting upon a showing of a deliberate and informed consent by the employee before employment relation will be held a bar to common-law suit." 1B Larson § 48.12, at 8–440; *see Smith,* 576 So.2d at 819 (borrowed servant status could only result from a clear and definite arrangement between the employers and with plaintiff's knowledge and acquiescence thereto); *Rouse,* 369 N.W.2d at 814; *Nussbaum v. Wright,* 217 Neb. 712, 715–17, 350 N.W.2d 559, 562 (1984) ("Consent cannot be inferred merely from the fact that the employee obeyed the commands of his master in entering the services of another.... Before such new relationship can be made effective, the servant must understand that he is submitting himself to the control of the new master."); *Skornia v. Highway Pavers, Inc.,* 39 Wis.2d 293, 159 N.W.2d 76, 79 (1968).

The record here indicates plaintiffs had no express contract of hire with P & G. In the next two subdivisions we discuss whether a fact question existed concerning any implied contract between plaintiffs and P & G.

A. *P & G's intent not to be an employer.* P & G had an express contract in this case, but it was with Kelly Services, not with the plaintiffs. It provided:

Contractor [Kelly] agrees that no authority has been conferred upon it by Buyer [Procter & Gamble] to hire any person or persons on behalf of [Procter & Gamble], and [Procter & Gamble] undertakes no obligation of any sort to [Kelly's] employees. It is understood that [Kelly] shall select, engage, and discharge its employees, agents or servants and otherwise direct and control their services. It is further understood that for all purposes of this Agreement, [Kelly] is an independent contractor and, as such, [Kelly] agrees to comply with and shall be responsible for all requirements of Federal, State and Local laws and regulations, including ... Workers' Compensation....

This contract reveals P & G's side of the bargain; it indicates that P & G intended not to enter into an employment contract with the Kelly workers. *Cf. Kirby v. Union Carbide Corp.,* 373 F.2d 590, 595 (4th Cir.1967) (contract between special employer and general employer provided that plaintiff worker remain employee of the latter); *M.J. Daly Co. v. Varney,* 695 S.W.2d 400, 403 (Ky.1985)

("[W]here the intent of the parties involved is expressed through such contractual relationships, the parties have fixed their status and we recognize their right to do so."). The contract delegates to Kelly the responsibility of an employer, even going so far as to label Kelly an independent contractor. We believe the language in this contract militates against the existence of an implied contract between plaintiffs and P & G. Although the contract does not specifically label the Kelly workers as nonemployees, it certainly does not establish their employment status as P & G's employees as a matter of law.

P & G representatives confirmed this attitude. Brian Butler, a P & G personnel manager, testified that Kelly workers were not considered P & G employees for purposes of wage rate setting and that Kelly workers were not placed on company personnel lists. John Leroy Bain, a project engineer at P & G who worked with both P & G employees and Kelly workers, testified that the Kelly people were not considered P & G employees in the workplace.

B. *Plaintiffs' understanding that they were not P & G employees.* P & G argues that the plaintiffs became employees because they accepted P & G's supervisory role. Yet substantial evidence in the record suggests just the opposite. For instance, Francis Greazel, a former on-site supervisor for Kelly at the P & G plant, testified that he never considered himself a P & G employee and that other Kelly employees shared his view.

Greazel noted that in addition to the treatment the Kelly workers suffered at the plant, Kelly workers were not allowed to join the company labor association or company softball team. Michael Falkowitz, Kelly's branch manager in Iowa City, stated that it was his understanding that Kelly workers did not become P & G employees and noted that the agreement reproduced above was drafted by P & G's legal staff.

Under this record, defendant P & G failed to establish as a matter of law that for purposes of Iowa Code section 85.61(11) plaintiffs had a deliberate and informed intent to enter into an employment relationship with P & G.

■ III. *Multifactored test as support for plaintiffs' position.* Defendant P & G relies heavily on the five factor employment test that we set out in *Henderson v. Jennie Edmundson Hospital,* 178 N.W.2d 429, 431 (Iowa 1970). As we have indicated above, we believe the application of this test is unnecessary because no contract of hire as a matter of law has been shown. The factors are only an aid to the analysis, *Rouse,* 369 N.W.2d at 814, and of secondary consideration to the contract requirement.[1] *Henderson,* 178 N.W.2d at 431 ("[I]n addition to the [five factor test] we recognize the overriding element of the intention of the parties. . . .").

Even if these factors [2] are relevant, however, we believe they only reinforce the argu-

1. Plaintiffs take issue with this test because of language found in our past cases rejecting the "borrowed servant" doctrine. *See Hassebroch v. Weaver Constr. Co.,* 246 Iowa 622, 633, 67 N.W.2d 549, 556 (1954) (holding that "loaned employee doctrine does not apply to workers' compensation cases"); *Muscatine City Water Works v. Duge,* 232 Iowa 1076, 1085, 7 N.W.2d 203, 208 (1942); *Hoover v. Independent Sch. Dist. of Shenandoah,* 220 Iowa 1364, 1366–67, 264 N.W. 611, 612 (1936).

It is to be noted that our rejection of the doctrine in these earlier cases was grounded on the element "requirement of a contract," which the doctrine did not then require. As we have explained, the present understanding of the doctrine now lists the requirement of a contract as paramount. This cures our expressed objection to the doctrine.

2. For purposes of simplicity, we refer to the five factor test found in cases such as *Rouse,* 369

N.W.2d at 814, and *Henderson,* 178 N.W.2d at 431. Larson proposes a variation of this test for purposes of determining whether an employee of a general employer becomes an employee of a special employer. That test lays out a three prong inquiry: (1) whether a contract existed with the special employer; (2) whether work done is essentially that of the special employer; and (3) whether the special employer had the right to control the details of the work. 1B Larson § 48.00, at 8–434. Elements (2) and (3) can be found in elements (5) and (4), respectively, of our *Henderson* test, and element (1) is simply a restatement of the overriding and paramount contract requirement in *Henderson.* It remains overriding and paramount in the special employer context. *See* 1B Larson § 48.11, at 8–440. Therefore, our analysis of the *Henderson* test fairly incorporates this three prong inquiry. We believe, however, that the *Henderson* analysis controls in this case.

ment that the plaintiffs here were not employees of P & G.

Under this test, the factors by which to determine whether an employment relationship exists are:

(1) the right to selection, or to employ at will;

(2) responsibility for the payment of wages by the employer;

(3) the right to discharge or terminate the relationship;

(4) the right to control the work; and

(5) is the party sought to be held as the employer the responsible authority in charge of the work or for whose benefit the work is performed.

*Henderson*, 178 N.W.2d at 431.

First, Kelly had the primary right to select the employees who worked for P & G or other Kelly accounts. The applications were filled out at Kelly, the employees took drug tests at Kelly, and P & G generally accepted any worker that Kelly sent. If any doubt on that issue exists, however, P & G resolved it in its contract with Kelly: "the Contractor [Kelly] shall select ... its employees."

Second, Kelly and not P & G determined the wages the Kelly workers received for labor performed on P & G's premises. Kelly was responsible for the workers' time cards, issued the paychecks, and provided the workers W–2 income tax forms. To say that P & G "paid" the plaintiff workers' wages is tantamount to saying that a drug store paid those wages when it purchased an order from a P & G distributor.

Third, the right to discharge Kelly workers rested with Kelly. P & G could request that the worker be reassigned to another line in

It may be asserted that consent to the contract is essentially inferred when the five factor test indicates employment. That test, however, only focuses on the *employer's* consent to the employment relationship, not on the worker's. To rely on the five factor test as the sole indicator of whether an implied contract for hire existed renders the worker's intent irrelevant, contrary to our requirement that both parties consent to the employment relationship. *See Rouse*, 369 N.W.2d at 814; *see also* Anthony T. Kronman, *The Lost Lawyer* 348–49 (1993) (criticizing the use of multifactor balancing tests as barriers to genuine judicial deliberation).

the P & G plant and ultimately to another Kelly account, but Kelly had the primary authority over termination. Again, the language of the P & G–Kelly contract reinforced this: "the Contractor [Kelly] shall ... *discharge* its employees." (Emphasis added.)

Fourth, Kelly had control over the work of its workers at the P & G plant. Kelly's supervisor, Greazel, checked in the Kelly workers in the morning and served as an administrator and liaison between P & G management and the Kelly workers. Naturally, P & G had some control over the Kelly employees; P & G sought Kelly's services in order to maximize its production at the plant. But P & G was careful to include in its agreement with Kelly that Kelly "direct and control" the workers' services, taking on "no obligation of any sort" to those workers. *Cf. Kirby*, 373 F.2d at 595 ("The control test was designed for application to particular factual situations. It was not intended to be the handmaiden of legal casuistry.").

Finally, it seems that Kelly as much as P & G "was the responsible authority in charge of the work" and was the party "for whose benefit" the work was performed. Admittedly, the work performed by the Kelly workers benefited both P & G and Kelly, and P & G has a colorable argument under the related special/general employer test that the work being done was "essentially that of the special employer." This part of the analysis, however, provides little guidance under the facts presented: the work Parson and Usher performed benefited both employers and was as essential for Kelly's profitability as it was for P & G's.

■ Apart from any other considerations,[3] application of the five factor *Henderson* test

3. It is true that a majority of the other states that have passed on the issue have disagreed with our conclusion here. However, in addition to Larson's observation that "there is substantial *contra* authority," 1B Larson § 48.23, at 8–524, and our analysis above, each case in the temporary employer context differs from the next with respect to the circumstances surrounding the contract/consent element and the application of the multifactored tests. We believe our analysis more accurately reflects the conclusion that the law of this state demands under the record of this case.

suggests that the Kelly workers were not employees of P & G. Placing the factors in their proper perspective as an aid to the "paramount" consideration of whether plaintiffs and P & G intended to enter into a contract of employment, *see Rouse*, 369 N.W.2d at 814, we believe the district court erred in granting P & G's motion for summary judgment.[4] There was at least a genuine issue of material fact as to whether the plaintiffs entered into an employment relationship with defendant P & G.[5]

IV. *Conclusion.* For the above stated reasons, we believe summary judgment for defendant P & G was inappropriate in this case. Thus, we need not address the other contentions made by the parties. We vacate the decision of the the court of appeals, reverse the judgment of the district court, and remand the case for further proceedings.

**DECISION OF COURT OF APPEALS VACATED; JUDGMENT OF DISTRICT COURT REVERSED AND REMANDED.**

All Justices concur except HARRIS, J., who dissents and is joined by NEUMAN, ANDREASEN and TERNUS, JJ.

HARRIS, Justice (dissenting).

I respectfully dissent, believing that the *Henderson* five-factor test was essentially met and established an employer-employee relationship between P & G and the plaintiffs. *See Henderson v. Jennie Edmundson Hosp.*, 178 N.W.2d 429, 431 (Iowa 1970). I readily concede there is a certain anomaly in according P & G the status it strained hard to avoid in its contract with Kelly. This is not, however, an equity case in which estoppel is or could be asserted. To apply equitable principles in this type of action causes havoc with even more important legal principles.

The majority of jurisdictions support the doctrine of dual employment for "borrowed" employees or for employees forwarded by a labor-broker. Under the doctrine the work-er has simultaneous or dual employment with both the forwarding and receiving employer. I understand that the majority concedes that our basis for rejecting the doctrine no longer exists. Recognizing the doctrine should control this appeal.

I. The majority, on the basis of our holdings in *Henderson* and *Rouse v. State*, 369 N.W.2d 811 (Iowa 1985), contends that the five-factor test is not implicated because "no contract of hire as a matter of law has been shown." They further state, in reliance on these authorities, that the "factors are only an aid to analysis, ... and of secondary consideration to the contract requirement." In all respect, I am convinced the cited cases do not so hold.

The very purpose of the five-factor test is to determine whether there is an implied contract of hire; the test would be unnecessary in cases where an employer-employee relationship is already established by contract. Consent to the contract is essentially inferred when the five-factor test indicates employment. *Henderson* in fact holds that the five-factor test determines whether an employer-employee relationship exists and that such a relationship implies a contract on the part of the employer to hire and on the part of the employee to perform services. *Henderson*, 178 N.W.2d at 431.

*Rouse* does state that the five-factor test is an "aid to analysis." 369 N.W.2d at 814. It does not hold it is "only an aid," neither does it say, or suggest, it is of secondary importance to the contract requirement. *Id.*

The majority somehow sees the subject and purpose of the five-factor test as being a prerequisite for its application. This strikes me as simply wrong.

II. My main concern is with the precedent I perceive in the majority holding. The five-factor test recognized, and I think misapplied, by the majority was first developed in ordinary workers' compensation claims. Because a much greater societal prize is involved there than in an occasional negli-

---

4. In *Jones v. Sheller–Globe Corp.*, 487 N.W.2d 88, 93 (Iowa 1992), our court of appeals came to the contrary conclusion. Because *Jones* failed to recognize that the employment issue is a question of fact, it is not controlling here.

5. Plaintiffs did not file a cross-motion for summary judgment on the employment issue or on any other aspect of their claim.

gence suit, the majority holding seems highly likely to haunt us. Future injured workers employed by dual employers are in peril of facing rejection of workers' compensation benefits on the claim that there is no employment relationship. This would be most unfair in cases where routine workers' compensation claims arise and the forwarding employer failed in its contractual responsibilities to provide workers' compensation coverage.

We will then find we have paid too high a price for allowing these plaintiffs to proceed with their tort claims. Consistency with this majority holding will demand that we exonerate some future employer the responsibility for providing workers' compensation coverage. We should allow P & G the statutory immunity that, under these circumstances, an overwhelming majority of cases from other states have allowed. *Pettaway v. Mobile Paint Mfg. Co.*, 467 So.2d 228 (Ala.1985) (special employer immune to negligence suit where special employer controls details of employee's work and work was performed for benefit of special employer); *Daniels v. Riley's Health & Fitness Ctr.*, 310 Ark. 756, 840 S.W.2d 177 (1992) (holding a temporary employee was dual employee of both an athletic club and temporary service which placed him, leaving only a workers' compensation remedy); *Freeman v. Augustine's*, 46 Ill. App.3d 230, 4 Ill.Dec. 870, 360 N.E.2d 1245 (1977) (finding a temporary employee of a restaurant, whether a borrowed or joint employee, was an employee of the restaurant, barring her negligence action); *Chicago's Fitness Worker's Co. v. Industrial Comm'n*, 61 Ill.2d 340, 335 N.E.2d 434 (1975) (holding workers' compensation liability was joint and several between special and general employer of a temporary employee); *Fox v. Contract Beverage Packers*, 398 N.E.2d 709 (Ind. 1980) (finding a special employer, a manufacturing concern, was the employer of a temporary employee thereby barring temporary employer's negligence action); *Travelers Indem. Co. v. Insurance Co. of N. Am.*, 69 Md.App. 664, 519 A.2d 760 (1987) (holding a temporary employee of Manpower, Inc. who was injured while working for a special employer could not bring tort suit against special employer); *Arntz v. Southwestern Wilbert Corp.*, 156 Mich.App. 309, 401 N.W.2d

358 (1986) (holding that, under economic reality test, both state and business to whom "work fare" participant had been assigned were participant's employers for purpose of workers' compensation, barring his negligence action); *Farrell v. Dearborn Mfg. Co.*, 416 Mich. 267, 330 N.W.2d 397 (1982) (holding that the employee of a labor broker was provided to the broker's customer, under the economic reality test, was barred from bringing a negligence action against the customer); *Renfroe v. Higgins Mfg. Co.*, 17 Mich. App. 259, 169 N.W.2d 326 (1969) (same); *Solakis v. Roberts*, 395 Mich. 13, 233 N.W.2d 1 (1975) (same); *Danek v. Meldrum Mfg. & Eng'g Co.*, 312 Minn. 404, 252 N.W.2d 255 (1977) (even though contract between special and general employer read "customer acknowledges and agrees that the persons assigned are the special employees of [special employer] and not employees of the customer," special employer found to be "employer" for workers' compensation purposes); *Wright v. Habco, Inc.*, 419 S.W.2d 34 (Mo. 1967) (special employer of temporary employee found to be employer for workers' compensation purposes); *Antheunisse v. Tiffany Co.*, 229 N.J.Super. 399, 551 A.2d 1006 (1988) (same); *Lesanti v. Harmach Indus.*, 175 A.D.2d 664, 664, 573 N.Y.S.2d 802 (1991) (holding that where the temporary employee reported at the special employer's plant, punched a time clock, was supervised in her production work by special employer, and work was for the benefit of the special employer, a negligence suit was barred under the workers' compensation system); *Richiusa v. Kahn Lumber & Millwork Co.*, 148 A.D.2d 690, 539 N.Y.S.2d 438 (1989) (finding that an employee who worked at a truck repair shop for two years, received uniforms from the company, was instructed and supervised by a company foreman, and who filed for workers' compensation benefits was an employee of the company resulting in a dismissal of employee's tort suit); *Campbell v. Central Terminal Warehouse*, 56 Ohio St.2d 173, 10 Ohio Op.3d 342, 383 N.E.2d 135 (1978) (holding a special employer was the employer of a temporary employee for workers' compensation purposes, thereby precluding a negligence action); *Robinson v. Omark Indus.*, 46 Or.App. 263, 611 P.2d 665 (1980)

(holding that where the temporary employee received workers' compensation from the special employer and was under the control of a special employer, the special employer was immune from tort liability); *Denison v. Haeber Roofing Co.,* 767 S.W.2d 862 (Tex. App.1989) (same). *Contra Novenson v. Spokane Culvert & Fabrication Co.,* 91 Wash.2d 550, 588 P.2d 1174 (1979) (finding, 5–4, that a temporary worker who was injured working for a customer of a temporary employment agency was not employee of the customer and thereby allowing tort action). While not controlling it is significant that we denied further review from a case of our own court of appeals that held in accordance with the majority holdings. *Jones v. Sheller–Globe Corp.,* 487 N.W.2d 88, 92 (Iowa App.1992).

III. The five-factor test, applied here to undisputed facts, clearly establishes an employment relationship between plaintiffs and P & G. I do not consider the question to be at all close. We should take great care in applying the five-factor test, remembering that employers may or may not acquire their temporary workers through a labor broker. Focus should be on the relationship between the temporary worker and the ultimate employer who in the future may wish to resist, not a tort suit, but a host of workers' compensation claims.

Because the alleged injuries arose while the plaintiffs worked at the P & G plant, the concern is only with work done there, not any other work done by plaintiffs for Kelly. This is especially important in considering the first (right of selection) and third (right to discharge) tests. P & G could not fire an employee from Kelly but could end its own relationship with the Kelly employee. P & G could also initially reject any employee sent to it by Kelly. This plainly amounts to a right of selection.

As to the second (responsibility to pay wages) test, P & G was required to pay Kelly an hourly rate per worker. Kelly implemented the payment of wages; P & G was responsible for them. Responsibility for payment is the key.

P & G's right to discharge employees is given in its contractual right to request "reassignment to another Kelly account" of any furnished worker. This terminates the relationship of the "reassigned" employee with P & G and establishes the third factor (right to discharge).

The fourth factor (right to control work) test is also clearly satisfied. The record shows:

(1) P & G determined the hours and shifts available to plaintiffs;

(2) plaintiffs were trained by full-time P & G personnel;

(3) plaintiffs were shown P & G videotapes or slides pertaining to how they were to conduct themselves at P & G;

(4) plaintiffs were supervised in the hands-on operation of the lines;

(5) P & G determined the need for Kelly temporaries;

(6) P & G established the quality of work to be performed by plaintiffs;

(7) P & G established all safety rules to which plaintiffs adhered;

(8) P & G provided all equipment or items to be used by plaintiffs, including machinery, tools, safety glasses, gloves and hair nets or restrainers;

(9) P & G controlled the time for breaks and lunch hours;

(10) P & G provided all the line machinery equipment and raw materials that go into the line; and

(11) P & G provided any support personnel needed to assist plaintiffs.

It is true that Kelly maintained an on-site supervisor at the P & G plant, but the duties of Kelly's on-site supervisor were perfunctory and limited to:

(1) receiving requisitions from P & G for the number of workers needed;

(2) sitting at a designated gate and checking the assigned Kelly temporaries in and out of the plant;

(3) unless a specific request was made assigning the Kelly temporaries to production lines of P & G where P & G indicated they were needed;

(4) receiving complaints regarding problems involving Kelly temporaries and attempting to resolve them; and

(5) maintaining records of performance and attendance.

It is clear that P & G held full and final authority at the plant to dictate how, where and when plaintiffs' work was to be done.

I think the fifth (for whose benefit work is performed) test is also satisfied. Although plaintiffs' work may also be said to have benefited Kelly, the work clearly benefited P & G.

I would affirm.

NEUMAN, ANDREASEN, and TERNUS, JJ., join this dissent.