# IN THE COURT OF APPEALS OF IOWA

No. 15-0783
Filed May 25, 2016

**THOMAS SAGER,**
        Plaintiff-Appellant,

**vs.**

**INNOVATIVE LIGHTING, L.L.C. d/b/a HAWKEYE MOLDING, INC.,**
        Defendant-Appellee.
_____

        Appeal from the Iowa District Court for Monroe County, E. Richard

Meadows Jr., Judge.


        An injured plaintiff appeals the district court's decision granting summary

judgment to the defendant on the question of immunity under Iowa Code section

85.20 (2013).  **REVERSED AND REMANDED.**



        George W. Appleby and James W. Carney of Carney and Appleby, Des

Moines, for appellant.

        Nicholas T. Maxwell and Michael J. Moreland of Harrison, Moreland,

Webber & Simplot, P.C., Ottumwa, for appellee.


        Heard by Vogel, P.J., and Doyle and Bower, JJ.

**VOGEL, Presiding Judge.**

Thomas Sager appeals the district court's decision, granting Innovative Lighting, L.L.C. d/b/a Hawkeye Molding, Inc.'s (Hawkeye's) motion for summary judgment and denying Sager's cross-motion for summary judgment. The fighting issue between the parties is whether Sager is considered to be an employee of Hawkeye. If Sager is an employee, he is precluded from suing Hawkeye for common law negligence for the injury he suffered while working at Hawkeye's facility. *See* Iowa Code § 85.20 (2013). The district court ruled in favor of Hawkeye, and Sager appeals, claiming there was no implied or express contract of employment between himself and Hawkeye. Upon our review, we conclude the record does not support a conclusion as to whether Sager was, or was not, an employee of Hawkeye as a matter of law. We therefore reverse the district court's summary judgment ruling and remand the matter for further proceedings.

**I. Background Facts and Proceedings.**

Hawkeye operates a facility in Albia, Iowa, which makes products by melting material into molds. Hawkeye employs "operators" through a staffing agency, Jacobson Staffing, to gather and package the products from the machines. Hawkeye does not directly employ its operators, but it refers all parties interested in such positions to Jacobson.

The contract between Jacobson and Hawkeye provides the worker is "an employee of Jacobson Staffing Company." However, the contract assigns to Hawkeye the "responsibility to provide supervision for Jacobson's employee's work on your premises or wherever you assign the employee." Hawkeye can reject a Jacobson worker if Hawkeye is not satisfied with that person's work

performance. Hawkeye provides all direct supervisory control over the Jacobson workers while they are at Hawkeye's facility.

The Jacobson workers use all the same facilities as permanent Hawkeye employees, though Jacobson workers do not wear clothing with Hawkeye's insignia. When Hawkeye provides lunch for its workers, it provides lunch for both permanent employees and temporary workers. It also provides all workers with a holiday gift in December.

Jacobson workers submit the hours they worked to Hawkeye in the same manner as permanent Hawkeye employees. Hawkeye then provides the hours to Jacobson, which issues the paychecks to the Jacobson workers. Hawkeye pays Jacobson based on the number of hours the temporary employees work plus a 45% markup. From the percentage markup Jacobson collects its fee and provides the administrative functions of employment such as unemployment insurance; workers' compensation coverage; medical, dental, and vision insurance; and tax withholdings, for the temporary workers.

Sager moved back to Iowa in late March 2012 and his cousin, Todd Leavitt, referred Sager to Jacobson so that Sager could start work at the Hawkeye factory. Sager, along with his cousin, applied to Jacobson, and both were placed at the Hawkeye factory in April. At the time Sager applied, the job at Hawkeye was the only work he was offered by Jacobson. Sager was trained and supervised by Hawkeye employees, who showed Sager the machine he would be working on each day.

On May 30, 2012, Sager was injured when hot plastic came out of a machine and landed on the back of his right hand. Sager made a workers'

compensation claim against Jacobson's workers' compensation carrier and received a settlement. Hawkeye did not file a first report of injury or refer the injury to its workers' compensation carrier or Iowa OSHA. Sager returned to Hawkeye for work after the injury, but he later decided to leave, saying he was leaving for a better paying job, that he "love[d] working at Hawkeye" but he "just had a kid so have to have more money." After he resigned his position at Hawkeye, Sager did return to Jacobson and was placed in positions for other customers of Jacobson.

On March 25, 2014, Sager's attorney sent a letter to Hawkeye stating Sager was "an employee of Hawkeye via a staffing company (Jacobson Staffing)." The letter mentioned Sager's hand injury and asked for the manufacturer of the injection molding machine that injured Sager. It also asked for the names of Sager's supervisors who were responsible for maintaining a safe working environment. The letter mentioned Sager was in the process of resolving his workers' compensation claim but that under Iowa law he could bring a third party claim against a manufacturer or a co-employee for gross negligence.

Hawkeye's director of human resources responded to the letter on April 2, 2014, in which she asserted Sager was not a Hawkeye employee on the date of the injury but instead was an employee of Jacobson. The letter informed Sager's counsel that all workers' compensation claims should be directed at Jacobson and its insurer. The letter informed Sager's attorney of Sager's supervisor the day of the accident, a Hawkeye employee, and also the manufacturer of the machine that injured Sager.

Sager, in an affidavit filed as part of the summary judgment motions, asserted he was never informed he was an employee of Hawkeye or a "joint employee" of both Jacobson and Hawkeye. He claimed he never received an employee manual from Hawkeye or wore any clothing with Hawkeye's label. He claimed his "boss" was a Jacobson employee, and he reported to that person regarding his work. He claimed he never filled out a Hawkeye application or received any kind of performance review from Hawkeye.

Sager filed suit against Hawkeye on May 21, 2014, alleging Hawkeye was negligent in several ways, which caused Sager's injury. Hawkeye filed an answer denying that it was negligent and asserting Sager's claim was barred or reduced by comparative fault. Hawkeye then filed for summary judgement on October 24, 2014, asserting it was immune from liability under Iowa Code section 85.20. Sager resisted Hawkeye's motion and filed a cross-motion for summary judgment, arguing the undisputed facts established he was not an employee of Hawkeye as a matter of law. Hawkeye filed a resistance to the cross-motion for summary judgment, and the court held an unreported hearing on the motions on January 30, 2015. In its ruling in favor of Hawkeye, the district court concluded, "[T]he parties' acts and deeds indicate they did intend to enter an employment relationship." The court found "only one reasonable inference can be drawn" from the undisputed facts of the case and that conclusion was that Sager and Hawkeye "intended to enter into an employment relationship."

Sager appeals.

## II. Scope and Standard of Review.

Our appellate court reviews the district court's summary judgment decision for correction of errors at law. *Pitts v. Farm Bureau Life Ins. Co.*, 818 N.W.2d 91, 96 (Iowa 2012). When determining whether summary judgment is proper, "we examine the record in the light most favorable to the nonmoving party," and we draw "every legitimate inference that can be reasonably deduced from the evidence." *City of Postville v. Upper Explorerland Reg'l Planning Comm'n*, 834 N.W.2d 1, 6 (Iowa 2013) (citations omitted). "The district court properly grants summary judgment when the moving party demonstrates there is no genuine issue of material fact and that he or she is entitled to judgment as a matter of law." *Boelman v. Grinnell Mut. Reins. Co.*, 826 N.W.2d 494, 501 (Iowa 2013). If the only conflict in the record concerns "the legal consequences of undisputed facts," then the case is properly resolved on summary judgment. *Pitts*, 818 N.W.2d at 96 (citation omitted). However, "[e]ven if facts are undisputed, summary judgment is not proper if reasonable minds could draw from them different inferences and reach different conclusions." *Goodpaster v. Schwan's Home Serv., Inc.*, 849 N.W.2d 1, 6 (Iowa 2014) (citation omitted).

## III. Implied Contract of Employment.

Iowa Code section 85.20 provides an employee's exclusive right and remedy against the employee's employer for injuries sustained on the job is workers' compensation benefits. However, "an employee may have more than one employer." *Caterpillar Tractor Co. v. Shook*, 313 N.W.2d 503, 506 (Iowa 1981). "[T]he threshold determination in deciding whether a worker falls into the workers' compensation scheme is whether the worker entered into a contract of

hire, express or implied." *Parson v. Procter & Gamble Mfg. Co.*, 514 N.W.2d 891, 893 (Iowa 1994); *see also* Iowa Code § 85.61(11) (defining "worker" or "employee," in part, as "a person who has entered into the employment of, or works under contract of service, express or implied, or apprenticeship, for an employer").

There is no assertion in this case that Sager and Hawkeye had an express employment contract. Thus, the question is whether it can be determined as a matter of law that Hawkeye did or did not have an implied employment contract with Sager, which would make this issue ripe for summary judgment, or whether reasonable minds could draw different conclusions from the facts, such that the issue should be submitted to a factfinder, not decided as a matter of law. It is ordinarily a question of fact as to whether a contract of hire exists, and there is a presumption that the general employer, in this case Jacobson, "continues as the sole employer." *Parson*, 514 N.W.2d at 893–94.

When determining whether an implied contract for employment exists, we "look for evidence of the employee's consent to an employment relationship with the alleged special employer." *Id.* at 894. In a borrowed-servant situation, our "primary focus is on the intent of the parties." *Iowa Mut. Ins. Co. v. McCarthy*, 572 N.W.2d 537, 542 (Iowa 1997). We may also consider five factors as an aid to determining whether there is a contractual relationship. *Id.* Those factors are:

> (1) the right of selection, or to employ at will, (2) responsibility for payment of wages by the employer, (3) the right to discharge or terminate the relationship, (4) the right to control the work, and (5) the identity of the employer as the authority in charge of the work or for whose benefit it is performed.

*Id.* (quoting *Shook*, 313 N.W.2d at 505). But, these factors are of secondary consideration to the contract requirement. As the *Parson* court noted, "To rely on the five factor test as the sole indicator of whether an implied contract for hire existed renders the worker's intent irrelevant, contrary to our requirement that both parties consent to the employment relationship." 514 N.W.2d at 895 n.2. Thus, our focus remains whether the parties had an informed and deliberate intent to enter into an employment relationship. *Id.* at 895.

In granting Hawkeye's motion for summary judgment the district court focused on the five factors, noting:

> [Hawkeye] had the right of selection, or to employ at will. [Hawkeye] was free to reject any employee sent to them by contacting Jacobson within 48 hours of the assignment. Second, . . . while Jacobson was responsible for directly paying [Sager's] wages, Jacobson was being paid by [Hawkeye] based upon the number of hours that [Sager] had worked. Third, [Hawkeye] had the right to terminate an employee. [Hawkeye] only needed to alert Jacobson that an employee was unsatisfactory, and Jacobson would replace that employee as quickly as possible. Fourth, [Hawkeye] had exclusive control over [Sager] at work. While the Jacobson-[Hawkeye] contract limited an employee's job responsibility to those stated in writing, [Hawkeye] had complete control as to which specific tasks an employee would undertake, as well as the manner of doing so. [Hawkeye] showed [Sager] the machines he would be working on and [Hawkeye] provided [Sager's] on-the-job training. [Sager's] supervisors at work were Clovie Coffman and Todd House, permanent employees of [Hawkeye]. Also, Jacobson had no managers or supervisors on-site in [Hawkeye's] plant. Finally, the work [Sager] was performing was being performed for [Hawkeye's] benefit. . . . Jacobson received a contractual benefit, but it was [Hawkeye's] business purpose that was furthered by [Sager's] work.

The district court likened this case to *Jones v. Sheller-Globe Corp.*, 487 N.W.2d 88, 91 (Iowa Ct. App. 1992), where our court determined as a matter of law that the temporary worker was an employee of both the labor broker and the

labor broker's customer. The *Jones* court found the labor broker's customer had the right to accept or reject any temporary employee, but yet had no say in whether that worker remained employed by the labor broker. 487 N.W.2d at 91. While the broker had the responsibility to pay the worker, the customer paid the broker based on the number of hours the employees worked. *Id.* The customer could discharge the worker from the daily work assignment by requesting the broker remove the employee. *Id.* The customer maintained full authority to control the work while the employee was at the job site, and the actual work performed was for the benefit of the customer. *Id.* The *Jones* court went on to further explain that, by virtue of going to work for a broker, the worker "knew or should have known when he signed up . . . that he would not actually be working for [the broker], but would be working for [the customer]." *Id.* at 92.

The district court then went on to distinguish this case from *Parson*. *See* 514 N.W.2d at 894–97. In *Parson* the court focused on the written contract between the labor broker and the customer, which provided the labor broker was an independent contractor and the customer "undertakes no obligation of any sort to [the broker's] employees." *Id.* at 894. The contract further provided the broker "shall select, engage, and discharge its employees, agents, or servants, and otherwise direct and control their services." *Id.* The *Parson* court concluded this language indicated the customer "intended not to enter into an employment contract with the [broker's] workers." *Id.*

The court went on to determine the worker's understanding was also that no employment relationship existed. *Id.* at 895. The broker had an on-site supervisor who testified he never considered himself to be an employee of the

customer and that other workers from the broker shared his view. *Id.* The supervisor noted how the temporary workers were denied the same treatment as other employees of the customer, such as being denied the ability to join the company labor association or play on the company softball team. *Id.* In addition, the broker's workers were paid less, and required to use separate break rooms, entrances, driveways, parking places, and gates. *Id.* at 892. The workers wore badges that were different from the customer's employees, and they were not allowed to use the cafeteria or locker room. *Id.*

The *Parson* court also analyzed the five-factor test, despite the fact it considered its use unnecessary. *Id.* at 895. The broker had the primary right to select and assign the employees to work for the broker's customers. *Id.* at 896. In addition, the customer generally accepted any worker that the broker sent. *Id.* The broker, not the customer, determined the wages the workers received while working on the customer's premises, and the broker was responsible for the time cards, paychecks, and tax forms. *Id.* While the customer could request a worker be reassigned, the broker had primary authority to terminate the worker. *Id.* The broker had an on-site supervisor, who would daily check the workers in and out of the customer's plant, and the contract between the broker and customer stated the broker would direct and control the workers' services. *Id.* Finally, the court concluded the work that was performed benefited both the broker and the customer. *Id.* Using these factors to aid in its determination of the parties' intent, the *Parson* court concluded a genuine issue of material fact existed as to whether the injured worker entered into an employment relationship with the broker's customer. *Id.* at 897.

With respect to Hawkeye's intent to enter into an employment contract in this case, the facts show the contract signed by Hawkeye and Jacobson referred to the workers as employees of Jacobson but assigned the responsibility for supervision to Hawkeye. However, the contract language between Jacobson and Hawkeye has little effect on illuminating Hawkeye's intent because the contract was drafted by Jacobson, not Hawkeye. Individuals interested in operator positions with Hawkeye were sent to Jacobson for application and screening. Hawkeye could reject workers but could not terminate them from Jacobson. All workers at the Hawkeye plant were treated the same with the exception that permanent employees could wear clothing with the Hawkeye name.

All employees submitted their work hours to Hawkeye in the same way, but Hawkeye provided the hours of Jacobson workers to Jacobson, which then issued the paychecks for those workers. Hawkeye paid a 45% premium on the Jacobson workers in exchange for Jacobson handling the administrative functions of employment.

With respect to Sager's intent, Sager's affidavit asserts it was his understanding that he was going to be solely the employee of Jacobson. However, his deposition testimony provided that his cousin referred him to Jacobson so that he could get a job with Hawkeye, specifically. *See Fletcher v. Apache Hose & Belting Co.*, 519 N.W.2d 839, 840–41 (Iowa Ct. App. 1994) (noting the worker was sent to the employment agency by the agency's customer and the worker specifically requested a placement at the customer which showed a deliberate and informed intent to enter into an employment relationship with the

customer). Sager was trained and supervised while at the Hawkeye facility by Hawkeye employees, but he stated he considered his "boss" to be a Jacobson employee. Sager's own attorney referred to him as an "employee of Hawkeye Molding via a staffing company." In addition, the attorney sought the names of supervisors at Hawkeye so that Sager could maintain a third party action against "co-employees for gross negligence."

However, in response to Sager's attorney's letter, the Hawkeye human resources director stated Sager "was not employed by Hawkeye Molding or Innovative Lighting on May 30, 2012, nor has he been employed by either company since that time." The letter stated Sager was an employee of Jacobson and all workers' compensation claims should be directed to Jacobson and its workers' compensation carrier.

Upon our review of the record, we cannot say as a matter of law that Sager and Hawkeye had an informed and deliberate intent to enter into an employment relationship. *See Parson*, 514 N.W.2d at 895. While the facts are largely undisputed, the inferences that can be drawn from those facts are not. *See Goodpaster*, 849 N.W.2d at 6 ("Even if facts are undisputed, summary judgment is not proper if reasonable minds could draw from them different inferences and reach different conclusions."(citation omitted)). Because the record does not support a conclusion as to whether Sager was, or was not, an employee of Hawkeye as a matter of law, we reverse the district court's summary judgment ruling and remand the matter to the district court for further proceedings.

**REVERSED AND REMANDED.**