# United States Court of Appeals

## For the Eighth Circuit

_____

No. 17-3055

_____

Rigoberto Quiles

*Plaintiff - Appellant*

v.

Alan Martin Johnson

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Southern District of Iowa - Des Moines

_____

Submitted: June 12, 2018
Filed: October 12, 2018

_____

Before LOKEN, ERICKSON, and GRASZ, Circuit Judges.

_____

LOKEN, Circuit Judge.

Rigoberto Quiles was severely injured when Alan Johnson fell asleep at the wheel and drove his tractor-trailer off I-80 in Adair County, Iowa. At the time of the accident, Quiles was a new employee of Swift Transportation Company of Arizona ("Swift"), an interstate motor carrier, who was completing Swift's commercial driving training program. Johnson was transporting goods for Swift as an independent contractor and serving as Quiles's "driving mentor" in Swift's training program.

Trainee Quiles was off-duty in the truck's sleeper berth. After receiving workers' compensation benefits from Swift, Quiles brought this diversity action against Johnson, alleging that Quiles's injuries were caused by Johnson's negligence in driving the truck. The district court[1] granted Johnson's motion for summary judgment, concluding that Quiles was a dual employee of Swift and Johnson, and therefore workers' compensation benefits were Quiles's exclusive remedy under the Iowa workers' compensation statute. Quiles appeals, arguing that genuine issues of material fact preclude the conclusion that he was Johnson's employee under Iowa law. Reviewing the district court's grant of summary judgment *de novo*, including its interpretation of state law, we affirm. See HIP, Inc. v. Hormel Foods Corp., 888 F.3d 334, 338 (8th Cir. 2018) (standard of review).

## I.

New Swift drivers must complete Swift's commercial driving training program before they may drive a truck on their own. Swift hired Quiles as an at-will commercial driving trainee in November 2014. Swift's Driver Handbook, which Quiles received and signed during orientation, described the training program as a mandatory driver-mentor "apprenticeship program." The program required Quiles to complete at least two hundred hours of behind-the-wheel driving with an assigned mentor, who evaluates the trainee's performance. For the first fifty hours, the mentor must sit in the passenger seat as the trainee drives. Thereafter, the trainee and mentor may "team drive," meaning that while one drives, the other is off duty and may remain in the truck's sleeper berth, which increases allowed operating time.

After orientation, Quiles completed fifty hours of training with a mentor but left this relationship and resigned from the program after the mentor failed to pick

---

[1]The Honorable John A. Jarvey, Chief Judge of the United States District Court for the Southern District of Iowa.

Quiles up at a prearranged location. Swift's driver development supervisor persuaded Quiles not to leave the program and assigned him a new mentor, Alan Johnson. Quiles began training with Johnson in early December 2014. Johnson and trainee Quiles did not sign a written agreement. Johnson's contract with Swift allowed him to participate in Swift's driver-mentor program by paying Swift $.05 "per loaded dispatched mile" driven with a Swift trainee. The contract provided that a trainee "shall remain a [Swift] employee during the period of time he/she is assigned to [Johnson's] truck. Any driver/trainee shall be considered a loaned employee or borrowed servant under applicable law." Johnson could not terminate Quiles' relationship with Swift, but Johnson could refuse to accept Quiles as a trainee and could discontinue the mentor relationship at any time. Likewise, Quiles could refuse or discontinue a mentor relationship at any time.

Because Quiles had completed fifty hours of training, he and mentor Johnson were authorized to team drive for the balance of Quiles's training. When they drove as a team, as on the day of the accident, each operated under his separate agreement with Swift. Swift hired Johnson for specific trips as an independent trucking contractor. Johnson decided when he would transport shipments for Swift, which determined when his truck would operate with driver trainee Quiles. Swift paid trainee Quiles an hourly wage when he rode with mentor Johnson. Swift's training program required the mentor to complete a Student Performance Assessment for every fifty hours of driving completed by the trainee; the trainee was required to complete Swift's Driver Training Paperwork. When off duty in the sleeping berth, mentor Johnson could monitor Quiles' driving via an application on his phone. All three contracting parties benefitted from this arrangement -- Johnson received Quiles' labor, permitting Johnson's truck to operate more hours with team driving. Quiles received instruction from Johnson, an hourly wage from Swift when team driving with Johnson, and credit toward completing the training program. Swift received the benefit of having shipments delivered with team driving while its trainee advanced toward becoming an employee qualified to drive a Swift truck on his own.

## II.

"When an employer's workers' compensation liability is insured and benefits are recoverable, an action for workers' compensation benefits is the exclusive remedy available to an employee against an employer for work-related injury." Subcliff v. Brandt Engineered Prods., Ltd., 459 F. Supp. 2d 843, 850 (S.D. Iowa 2006); see Iowa Code § 85.20(1) (2014). The workers' compensation statute defines "worker" or "employee" as "a person who has entered into the employment of, or works under contract of service, express or implied, or apprenticeship, for an employer." § 85.61(11). The critical issue in determining whether an injured worker is limited to the exclusive workers' compensation remedy "is whether the worker entered into a contract of hire, express or implied." Parson v. Procter & Gamble Mfg. Co., 514 N.W.2d 891, 893 (Iowa 1994). "The intent of the parties is the overriding element in determining whether an employment contract existed." Rouse v. State, 369 N.W.2d 811, 814 (Iowa 1985). "In Iowa, a contract will be implied where there has been a mutual manifestation of assent by acts and deeds (rather than words) to the same terms of an agreement." McBride v. City of Sioux City, 444 N.W.2d 85, 90 (Iowa 1989).

Under the Iowa statute, as in other States, "an employee may have more than one employer." Caterpillar Tractor Co. v. Shook, 313 N.W.2d 503, 506 (Iowa 1981); see Beaver v. Jacuzzi Bros., Inc., 454 F.2d 284, 285 (8th Cir. 1972) ("As a matter of common experience and of present business practices . . . it is clear that an employee may be employed by more than one employer even while doing the same work."). A claim of dual employment may be made by a putative employee seeking workers' compensation benefits, or by a putative employer seeking to limit the plaintiff in a tort action to the exclusive workers' compensation remedy. Dual employment is not contrary to policies underlying the workers' compensation statute. "Nothing in the statute prohibits joint employers from allocating between themselves the responsibility for obtaining insurance for their mutual workers' compensation

-4-

liability." <u>Subcliff</u>, 459 F. Supp. 2d at 851. In a dual employment case, the question is whether an employee of a "general" employer -- here, Swift -- simultaneously served as the employee of a "special" employer -- here, Johnson. "Although in Iowa an employee may have two employers, the presumption is that a general employer, such as [Swift], is the sole employer." <u>Swanson v. White Consol. Inds., Inc.</u>, 30 F.3d 971, 974 (8th Cir. 1994); <u>see</u> <u>Parson</u>, 514 N.W.2d at 894. The sole issue on appeal is whether the district court erred in concluding that, at the time of the accident, Quiles was the dual employee of Swift and Johnson.

As the district court noted, in the great majority of reported dual employment or "borrowed worker" decisions, the general employer was a temporary employment agency or broker in the business of "loaning" its employees to clients on a temporary basis to do the clients' work for a fee. Because the broker employed the temporary worker, paid his or her wages and fringe benefits, and paid premiums to provide workers' compensation insurance covering the temporary work, the question was whether the client was a special employer when the temporary employee suffered a work-related injury. In Iowa, these cases have turned on a fact-intensive analysis of whether there was a separate contract for hire, express or implied, between the employee and the special employer. <u>See</u> <u>Parson</u>, 514 N.W.2d at 894-97 (no express contract; strong evidence special employer did not intend to employ; summary judgment for employer reversed); <u>Fletcher v. Apache Hose & Belting Co.</u>, 519 N.W.2d 839, 840-41 (Iowa App. 1994) (no express contract but intent to employ temporary worker clear; special employer prevailed); <u>Jones v. Sheller-Globe Corp.</u>, 487 N.W.2d 88, 93 (Iowa App. 1992) (special employer prevailed because of its exclusive control over and benefit from the loaned employee's work; workers compensation provided through the broker); <u>Subcliff</u>, 459 F. Supp. 2d at 852 (express contract for hire established special employer's control over work; summary judgment for employer granted); <u>Swanson</u>, 30 F.3d at 974-75 (summary judgment for employee reversed; existence of contract for hire a disputed fact).

-5-

Though Johnson's contract with Swift stated that a driver trainee such as Quiles "shall be considered a loaned employee or borrowed servant under applicable law," the relationship between Swift and Johnson was much different than an employment broker's typical relationship with its clients. Assuming the requisite contract for hire between Quiles and Johnson, the leading workers' compensation treatise describes the resulting three-party relationship as "joint employment":

> Joint employment occurs when a single employee, under contract with two employers, and under the simultaneous control of both, simultaneously performs services for both employers, and when the service for each employer is the same as, or is closely related to, that for the other. In such a case, both employers are liable for workers' compensation.

2 Larson's Workers' Compensation, Desk Edition § 68.01, at p. 68-1. Quiles performed closely related services for both Swift and Johnson, under the simultaneous control of both. "Where a legitimate joint employment relationship is present it is to be expected that the employee's relationship with both employers would evince the attributes of employment encapsulated in the Henderson factors."[2] Subcliff, 459 F. Supp. 2d at 853. The agreement between Johnson and Swift provided that Johnson would provide workers' compensation insurance for his own employees, but Swift would provide workers' compensation for driver trainees assigned to Johnson. Johnson understood that the $0.05 he paid Swift for each loaded dispatched mile that a trainee rode in his truck was in part to pay for workers' compensation coverage.

---

[2]In Henderson v. Jennie Edmunson Hosp., 178 N.W.2d 429, 431 (Iowa 1970), the Supreme Court of Iowa discussed five factors, beyond intent of the parties, useful in determining the existence of an employer-employee relationship under Iowa law.

Although we think it clear that the agreement between Johnson and Swift established a joint employer relationship whenever independent contractor Johnson agreed to serve as mentor for a Swift employee completing its mandatory apprenticeship training program, the question remains whether Quiles and Johnson entered into an express or implied contract for hire when they agreed that Johnson would serve as Quiles's mentor. The district court concluded that undisputed facts demonstrate that Quiles intended to form an employment relationship with Johnson as well as Swift:

> The most persuasive action Quiles took was when he agreed to participate in the apprenticeship program as described in his employment agreement with Swift. All his subsequent actions demonstrate a continuing commitment to the apprenticeship program. Quiles agreed to accept a mentor in order to finish his apprenticeship. He then went to work with Johnson and participated in a team driving arrangement for four days before the collision occurred. He was free to end the relationship at any time and request a new mentor, but did not do so. From having reviewed the [training program] materials when he began his employment, Quiles was aware of the mentor's role in evaluating and training him during his apprenticeship, and of the fact that Johnson could indirectly control Quiles' pay by choosing when the semi would be operational. . . . It is particularly telling that Quiles continued to work with Johnson given that he had terminated his relationship with another mentor because he was dissatisfied with the prior mentor's work habits.

After careful review of the summary judgment record, we agree with this analysis. Like the district court, we consider it significant that the Iowa workers' compensation statute includes an "apprenticeship" as one type of "contract of service, express or implied" that is performed "for an employer." § 85.61(11); see Black's Law Dictionary 122 (10th ed. 2014) (defining "apprentice" as "someone who works for an employer for a fixed period in order to learn a particular skill or job"); Henderson, 178 N.W.2d at 433 ("In modern times, the apprentice works for the

-7-

master for wages, usually less than that received by the journeyman who has finished his training."). When a general employer's apprenticeship program requires its employee to apprentice with an independent contractor in performing work for the general employer's benefit, a joint employment is likely to occur.

Quiles enrolled in Swift's driving program knowing he would need to train under a mentor to complete Swift's apprenticeship program. The parties' separate agreements with Swift, and their actions in team driving to deliver shipments for Swift in Johnson's truck, demonstrate that both Johnson and Quiles intended to enter into an apprentice relationship -- "the overriding element in determining whether an employment contract existed." Rouse, 369 N.W.2d at 814. Whether a contract is express or implied concerns only the evidence by which the contract is proved. See Newman v. City of Indianola, 232 N.W.2d 568, 574 (Iowa 1975). Here, by both their words and their actions, Johnson and Quiles manifested their assent that Quiles would serve as Johnson's apprentice when they engaged in team driving to deliver shipments for Swift. We therefore conclude that Johnson and Quiles entered into an employment relationship in which Swift and Johnson were joint employers mutually liable under Iowa law to provide Quiles workers' compensation benefits when he suffered a work-related injury, an obligation Swift has fully performed. Accordingly, the workers' compensation benefits Quiles received are his exclusive remedy against Johnson.

The judgment of the district court is affirmed.

_____