# IN THE COURT OF APPEALS OF IOWA

No. 18-0712
Filed April 3, 2019

**MIKE MARION NIDAY,**
          Petitioner-Appellant,

**vs.**

**ROEHL TRANSPORT, INC.,**
          Respondent-Appellee.
_____

Appeal from the Iowa District Court for Polk County, Paul D. Scott, Judge.


An injured worker appeals the district court order finding the Iowa Workers' Compensation Commission had no jurisdiction to award benefits. **REVERSED AND REMANDED.**


Joseph S. Powell of Thomas J. Reilly Law Firm, P.C., Des Moines, for appellant.

Lee P. Hook and Tyler S. Smith of Peddicord Wharton, LLP, West Des Moines, for appellee.


Heard by Potterfield, P.J., and Tabor and McDonald, JJ, but Decided by Potterfield, P.J., and Tabor and Mullins, JJ.

**TABOR, Judge.**

We must decide if a truck driver injured outside of Iowa is entitled to workers' compensation benefits under Iowa Code section 85.71(1)(b) (2014). The key question is whether the "contract of hire" between employer Roehl Transport, Inc. (Roehl) and employee Mike Niday was "made in this state." Because the parties assented to all terms of the contract while Niday was in Iowa, his claim met the requirement of territorial jurisdiction under the statute. Accordingly, we reverse the district court's judicial review decision and remand for further proceedings.

**I.      Facts and Prior Proceedings**

In his mid-50s and looking for a career change, Niday enrolled in classes at Indian Hills Community College to earn his commercial driver's license (CDL). He worked as a supply-chain manager for Liguria Foods in Humboldt and attended weekend classes in the spring of 2013. On campus, Niday noticed posters advertising employment opportunities with Roehl.

Roehl is a nationwide trucking company with operating authority in forty-eight states—including Iowa. The company is headquartered in Marshfield, Wisconsin and has nine terminals in seven states—Wisconsin, Georgia, Indiana, Texas, California, Arizona, and Michigan. Roehl also has drop yards[1] across the country, though it has none in Iowa.

The posters sparked Niday's interest, so he asked one of his instructors if Roehl was a good employer. Because the instructor had positive views of the

---

[1] A "drop yard" is "a small area of land that trucking companies own and allows for drivers to park their trucks and trailers on it." *Trucking Terminology—Truck Driver Lingo*, CDL Training Today, https://cdltrainingtoday.com/cdl-training-resources/cdl-study-guide/trucking-terminology/ (last visited Mar. 26, 2019).

company, Niday decided to apply for a truck-driver position through Roehl's website after he earned his CDL in May 2013. Roehl receives applications from all over the country and reviews them at its corporate headquarters in Wisconsin.

Shortly after applying, Niday received a written notice from Roehl recruiter Alice Farvour-Smith congratulating him for passing Roehl's initial screening process. The notice advised Niday to call Farvour-Smith within two days if he was interested in progressing to the next steps of the hiring process. Before Niday had a chance to contact Farvour-Smith, she called to discuss employment with Roehl. Niday was on the job at Liguria Foods in Humboldt when he received Farvour-Smith's phone call. Niday testified:

> [They] said they had received my online application and would like to discuss me com[ing] to work for them.
>      . . . .
>      I don't remember verbatim, but I do remember that we discussed the divisions they had, flatbed, dry van, reefer, and I chose the flatbed division. They have different subdivisions, Midwest regional, national, and of course there's different pay packages. We discussed that. I told them I'd like to accept the Midwest regional, have a little more home time.

On May 10, Farvour-Smith followed up with a letter mailed to Niday's Dakota City, Iowa home. The letter began: "Congratulations! Based on the information we've received so far, I'm pleased to inform you that you qualify for a driving position with TeamRoehl." The letter advised Niday the employment offer was "conditional" based on (1) the continued accuracy of the information he provided in his application, (2) successful completion of a "pre-work screening" to ensure Niday could meet the physical demands of the job, (3) passage of a pre-employment drug screen, and (4) successful completion of "all the requirements" of Roehl's "Safety and Job Skills Program." The letter then described the two

phases of Roehl's training program—phase one consisted of classroom work, followed by a preliminary test; phase two involved over-the-road experience with another driver, followed by a final driving test. Additionally, the letter confirmed the specific position and associated pay Niday and Farvour-Smith discussed in their earlier phone conversation.

The letter instructed Niday to await a call from a Roehl representative in the next twenty-four hours to arrange a Department of Transportation medical examination, after which Roehl would schedule Niday's orientation. The letter promised Roehl would provide transportation to the designated phase-one training facility, as well as lodging and meals on phase-one training days. The letter concluded: "Again, congratulations on qualifying for this conditional offer of employment. You've completed the first steps toward a rewarding career at Roehl . . . ."

Niday provided Liguria Foods two weeks' notice of his intent to leave his job as supply-chain manager. Roehl arranged for Niday to pick up a rental car in Des Moines on June 1 and directed him to report to Marshfield, Wisconsin for orientation beginning June 3. In Marshfield, Niday completed an "application addendum" supplementing his initial application from May 8 and underwent a drug test. The following day, Niday reported to Roehl's Gary, Indiana terminal for classroom training.

On June 10, Niday completed the phase-one classroom training and passed the preliminary driving test. Roehl identifies that day as Niday's hiring date, despite the fact he had yet to complete the second phase of training and Farvour-Smith's

May 10 letter conditioned his employment offer on completion of "all requirements of [the] Safety and Job Skills Program."

For the second phase, Roehl paired Niday with a trainer who observed him drive the trainer's truck "all over the United States." After this on-the-road training, Niday returned to Indiana for the final driving test. Niday testified an instructor informed Niday he passed the test and assigned him a fleet manager.[2] Niday's fleet manager, Gina Sanders, directed him to pick up a truck from Roehl's maintenance shop in Gary. Niday retrieved the truck and returned home to Iowa, set to begin driving solo routes for Roehl.

While working for Roehl, Niday received his load assignments through the computer in his truck. When he accepted an assignment, Roehl sent Niday directions to the pick-up site. Niday would drive to the vendor, load the goods into his truck, and inform Roehl once the goods were secured so Roehl could send

---

[2] Karen Cliver, a Roehl administrator, stated in her sworn affidavit Niday was hired "upon the successful completion of training" and assigned a fleet manager "upon being hired." Roehl presented no additional testimony. The deputy commissioner made no findings regarding the inconsistency of Cliver's statements with Niday's account, but the deputy did find Niday's testimony credible. The fact findings summarized the timeline:

> Claimant testified following classroom training, he took a driving test in Indiana. He then began over-the-road training with another driver. Once he began this work, claimant indicated he began to receive a regular paycheck. At the conclusion of this training, claimant completed a final driving test in Gary, Indiana. Upon successful completion, defendant's employee Gina Sanders called him, introduced herself as his fleet manager, and advised him to proceed to the maintenance shop to pick up his keys and trailer. He then began driving solo routes for defendant.

And later, the deputy's conclusions of law provided:

> The May 2013 conversation and letter served essentially as an agreement to agree to enter into an employment contract upon successful completion of the conditions precedent. These conditions were likely met while claimant participated in the training process in Gary, Indiana; the conditions were most certainly not met while claimant remained in Iowa prior to presenting for training.

directions to the destination. In his deposition, Niday testified the pick-up locations varied based on his location at a given time:

> About every time I left my home I would have a run out of Iowa, because [Roehl] always tried minimizing your deadhead miles when you're not carrying freight. So Monday mornings that I would leave, it was generally a run located out of Iowa.
> And then from there it just depended on where I dropped, and they would give me a close pickup to run from there. But most of my runs when I left home [were] out of the Iowa area.

Of the seventy-three assignments Niday completed for Roehl, twenty-five were either picked up from or delivered to Iowa locations.

In November 2013, Niday picked up a load of large aluminum coils from Logan Aluminum in Kentucky. After much heavy lifting, Niday became winded. At first, he blamed the humidity for his difficulty breathing. But then he developed chest pain. A warehouse employee called Logan's on-site paramedics, and an ambulance transported Niday to a hospital. Niday had suffered a heart attack.

On June 30, 2014, Niday filed a petition with the Iowa Workers' Compensation Commission seeking benefits. Roehl denied Niday's claim, arguing the commission lacked jurisdiction because the injury occurred outside of Iowa and none of the grounds in Iowa Code section 85.71 applied. A deputy commissioner heard the matter and filed an arbitration decision finding the commission lacked jurisdiction over Niday's claim because the "contract of hire" was not made in Iowa and Roehl did not have a "place of business" in Iowa. The deputy characterized the May 2013 conversation and letter while Niday was in Iowa as "an agreement to agree to enter into an employment contract upon successful completion of the conditions precedent." The deputy held those conditions "were likely met" in Indiana.

Niday unsuccessfully appealed to the commissioner, who adopted the deputy's decision. Niday then sought judicial review in Iowa District Court for Polk County. After a February 2018 hearing, the district court agreed with the commission, concluding the contract of hire was made outside of Iowa and Roehl had no place of business in Iowa, so the agency lacked jurisdiction to hear Niday's claim under Iowa Code section 85.71(1)(a) or (b). Niday appeals.

## II.     Scope and Standards of Review

Section 17A.19(10) (2017) of the Iowa Administrative Procedure Act governs our review of agency decision-making. *Neal v. Annett Holdings, Inc.*, 814 N.W.2d 512, 519 (Iowa 2012). On judicial review, the district court acts in an appellate capacity. *Id.* When reviewing the district court's decision, "we apply the standards of [c]hapter 17A to determine whether the conclusions we reach are the same as those of the district court. If they are the same, we affirm; otherwise, we reverse." *Id.* (quoting *Mycogen Seeds v. Sands*, 686 N.W.2d 457, 463 (Iowa 2004)).

When factual findings are not challenged on appeal, but instead the claimed error is in the agency's interpretation of law, we decide if that interpretation was erroneous.[3] *Meyer*, 710 N.W.2d at 219. If we conclude the agency's interpretation was erroneous, we substitute our interpretation of the law. *Id.* Finally, if

---

[3] In *Heartland Express, Inc. v. Terry*, 631 N.W.2d 260, 266 (Iowa 2001), our supreme court framed the issue on appeal as "whether there was substantial evidence to support the chief deputy's finding that the contract of hire took place in Iowa," citing *Anstey v. Iowa State Commerce Commission*, 292 N.W.2d 380, 384 (Iowa 1980), for the proposition the "substantial evidence test governs review of agency action regarding jurisdictional facts." But this statement does not mean any issue related to jurisdiction will be undisturbed on appeal if supported by substantial evidence. Instead, *Anstey* confirmed factual findings related to jurisdiction are treated like any other factual findings. *See* 292 N.W.2d at 384.

the claim of error lies with the ultimate conclusion reached, then the challenge is to the agency's application of the law to the facts, and the question on review is whether the agency abused its discretion by, for example, employing wholly irrational reasoning or ignoring important and relevant evidence. *See* Iowa Code § 17A.19(10)(i), (j).

*Id.*

Here, the parties agree the claimed error stems from the agency's interpretation and application of contract law principles; the facts are undisputed.[4] Neither party asserts the legislature vested authority in the commissioner to interpret the statutory phrase "contract of hire" nor do we find any indication the legislature intended to delegate such authority to the commissioner. *See Neal*,

---

Despite branding it a question of substantial evidence, the *Terry* court went on to correct a legal error, concluding the claimant's job application could not, as a matter of law, constitute an offer. *See* 631 N.W.2d at 268–69. Our supreme court has since clarified the importance of pinpointing the question on appeal. *See Meyer v. IBP, Inc.*, 710 N.W.2d 213, 219 (Iowa 2006) ("In sum, when an agency decision on appeal involves mixed questions of law and fact, care must be taken to articulate the proper inquiry for review instead of lumping the fact, law, and application questions together within the umbrella of a substantial-evidence issue."). We examine an agency's legal conclusions for soundness even when related to jurisdiction. *See, e.g.*, *Heartland Express v. Gardner*, 675 N.W.2d 259, 262 (Iowa 2003) ("We typically review a district court's decision on judicial review for correction of errors at law. This standard dovetails with our review of jurisdictional questions, which is also for correction of errors at law." (internal citations omitted)); *Annett Holdings, Inc. v. Allen*, 738 N.W.2d 647, 648–49 (Iowa Ct. App. 2007) (reviewing commissioner's interpretation of Iowa Code section 85.71 under the "erroneous" standard).

[4] "The question of whether a contract of hire exists is ordinarily one of fact." *Parson v. Procter & Gamble Mfg. Co.*, 514 N.W.2d 891, 893–94 (Iowa 1994). This principle follows from the "general rule of contract law that 'the determination of the intent of the parties to make a contract, as gathered from what they did and said, is normally a question of fact for the jury, particularly where the terms of the contract are unclear.'" *Id.* (quoting 75A Am. Jur. 2d *Trial* § 795, at 403 (1991)). Here, the deputy commissioner made no findings regarding the parties' intent, but did find credible Niday's testimony that Roehl offered and he accepted the job and corresponding terms during the early-May phone call. The agency's conclusion the contract of hire was made outside of Iowa was based on its characterization of the communications between Niday and Roehl as merely an "agreement to agree" pending Niday's fulfillment of the conditions. So too was the district court's conclusion based on its belief a contract could not be formed until the fulfillment of all conditions contained in an agreement rather than a finding of lack of intent to enter into a contractual relationship.

814 N.W.2d at 519; *see also* Iowa Code § 85.71; *Iowa Ins. Inst. v. Core Grp. of Iowa Ass'n for Justice*, 867 N.W.2d 58, 65 (Iowa 2015) ("In recent years, we have repeatedly declined to give deference to the commissioner's interpretations of various provisions in chapter 85."). Accordingly, we do not defer to the agency's interpretation. *See Neal*, 814 N.W.2d at 519. "We will reverse if we find the agency's decision was '[b]ased upon an erroneous interpretation of a provision of law.'" *Andover Volunteer Fire Dep't v. Grinnell Mut. Reinsurance Co.*, 787 N.W.2d 75, 80 (Iowa 2010) (quoting Iowa Code § 17A.19(11)(b)).

When interpreting provisions of chapter 85, we remain cognizant of its purpose: to benefit injured workers. *Jacobson Transp. Co. v. Harris*, 778 N.W.2d 192, 197 (Iowa 2010).

## III.     Analysis

Iowa Code section 85.71 outlines when an employee is entitled to benefits if his or her injury occurs outside of Iowa.[5] The statute lists five ways an employee may qualify for benefits:

---

[5] Our supreme court has interpreted section 85.71 as conferring subject matter jurisdiction to the commission over claims arising from extraterritorial injuries. *See, e.g.*, *Terry*, 631 N.W.2d at 265. So, not surprisingly, the parties dub the issue on appeal as one of subject matter jurisdiction. But in 2008, the legislature amended section 85.71 to add: "This section shall be construed to confer personal jurisdiction over an employee or employer to whom this section is applicable." 2008 Iowa Acts ch. 1091, § 2. While the distinction is not dispositive in the instant dispute, section 85.71 reads more like a test for extraterritorial jurisdiction or a long-arm statute rather than defining the commission's subject matter jurisdiction. *See Extraterritorial Jurisdiction*, *Black's Law Dictionary* (10th ed. 2014) ("A court's ability to exercise power beyond its territorial limits."); *see also Jahnke v. Deere & Co.*, 912 N.W.2d 136, 142 (Iowa 2018) (discussing the presumption of territorial application of statutes and noting section 85.71 "affirmatively states that it applies to employees injured 'while working outside the territorial limits of this state' if certain circumstances are met"); *Cargill, Inc. v. Conley*, 620 N.W.2d 496, 501 (Iowa 2000) ("'Subject matter jurisdiction is the authority of a court to hear and determine cases of the general class to which the proceedings belong, not merely the particular case then occupying the court's attention.' *Bailey v. Batchelder*, 576 N.W.2d 334, 337 (Iowa 1998).

> (a) The employer has a place of business in this state and the employee regularly works at or from that place of business.
> (b) The employee is working under a contract of hire made in this state and the employee regularly works in this state.
> (c) The employee is working under a contract of hire made in this state and sustains an injury for which no remedy is available under the workers' compensation laws of another state.
> (d) The employee is working under a contract of hire made in this state for employment outside the United States.
> (e) The employer has a place of business in Iowa, and the employee is working under a contract of hire which provides that the employee's workers' compensation claims be governed by Iowa law.

Iowa Code § 85.71(1).

Niday relies on subsection (b), which requires proof of two elements: (1) at the time of the injury, he was working under a "contract of hire" made in Iowa; and (2) he regularly worked in Iowa.[6] Neither party disputes Niday regularly worked in Iowa. The fighting issue is whether the "contract of hire" was "made in this state."

We determine the place of contracting based on the parties' intention to form a binding contract. *Terry*, 631 N.W.2d at 266–67 (quoting *Burch Mfg. Co. v. McKee*, 2 N.W.2d 98, 101 (Iowa 1942)).

> As a rule [the place of contracting] is considered to be the place where the offer is accepted, or where the last act necessary to a meeting of the minds, or to complete the making of the contract, is performed. . . . [T]he place of contract is the place where the acceptance is made, as, if a resident of one state places a letter in the mail making an offer to one who resides in another state, the contract would be completed where the acceptance is mailed.

*Id.* (quoting *McKee*, 2 N.W.2d at 101).

---

. . . The problem with Cargill's argument is that the industrial commissioner did have subject matter jurisdiction of the claim presented to her—a claim for workers' compensation benefits.").

[6] Alternatively, Niday argues he meets the criteria in subsection (a). Niday asserts, because he received assignments while in Iowa and began and ended every run from his home, his Iowa residence was his "home terminal," constituting Roehl's "place of business" under the statute. *See* Iowa Code § 85.71(1)(a). Because Niday meets the criteria in subsection (b), we need not reach this issue.

To be bound by a contract, the parties "must manifest a mutual assent to the terms of the contract, and this assent is usually given through the offer and acceptance." *Kristerin Dev. Co. v. Granson, Inc.*, 394 N.W.2d 325, 331 (Iowa 1986). Here, Niday and Roehl agreed to the terms of Niday's employment during Farvour-Smith's May phone call to Niday, answered by Niday while in Iowa. Farvour-Smith confirmed the terms the parties discussed on the phone in a letter sent to Niday's Iowa residence. So the crux of the dispute is whether the requirements listed in the May 10 letter constituted conditions precedent[7] to performance of the contract or conditions precedent to formation of the contract.[8] Roehl contends they were conditions precedent to formation, so the contract was not made until Niday fulfilled the training requirements in Gary, Indiana. Roehl argues the conditional nature of its offer meant the exchange in Iowa was merely an "agreement to enter into an agreement," citing *Khabbaz v. Swartz* for the

---

[7] The Second Restatement of Contracts abandons the terms condition precedent and condition subsequent—instead employing the term "condition" in place of condition precedent, and replacing condition subsequent with "an event terminating a duty." Restatement (Second) of Contracts § 224 reporters note cmts. c, e (Am. Law Inst. 1981).
[8] In its appellate brief, Roehl quotes the following passage from *Magnussen Agency v. Public Entity National Co.-Midwest*, 560 N.W.2d 20, 26 (Iowa 1997): "An offer that invites an acceptance by performance is deemed accepted by such performance unless there is a manifestation of intention to the contrary." Although that language from *Magnussen* describes a unilateral contract, Roehl does not use the term "unilateral contract" in its brief. In fact, Roehl fails to further develop an argument that its contract was unilateral. Roehl does not point to facts or case law supporting a contention the contract was unilateral. *See Daeges v. Beh*, 224 N.W. 80, 81 (Iowa 1929) ("It is presumed that an offer invited the formation of a bilateral contract by an acceptance amounting, in effect, to a promise by the offeree to perform what the other requests."); Restatement (First) of Contracts § 31 (Am. Law Inst. 1932) ("In case of doubt it is presumed that an offer invites the formation of a bilateral contract by an acceptance amounting in effect to a promise by the offeree to perform . . . , rather than the formation of one or more unilateral contracts by actual performance on the part of the offeree."). Without a more fully-formed argument, we decline to address the possibility the contract was unilateral. *See Hyler v. Garner*, 548 N.W.2d 864, 876 (Iowa 1996) ("[W]e will not speculate on the arguments [the parties] might have made and then search for legal authority and comb the record for facts to support such arguments.").

proposition "[n]onperformance of a condition precedent vitiates a contract or a proposed contract." 319 N.W.2d 279, 284 (Iowa 1982). Roehl asserts its communications with Niday "could certainly have been considered a proposed contract with conditions precedent."

Contrary to Roehl's assertion, the agreement reached in the May telephone call and confirmed by letter was more than a "proposed contract." Iowa case law uses the term "proposed contract" when "no mutuality of assent [exists] between the parties." *See Bruggemeyer v. Bruggemeyer*, 258 N.W.2d 364, 365–66 (Iowa 1977) (finding no mutual assent to proposed contract for purchase of real estate where defendants' counsel notified plaintiffs' counsel that client would not sign contract until disputed pasture rent had been paid and rent was never paid). By contrast, all the terms of Niday's employment were settled in the phone call and reiterated in the May 10 written confirmation. Roehl does not contend that any terms of Niday's employment were left up in the air. Instead, the company argues,

> Niday's receipt of the terms of the May 10, 2013, letter did not create a legally binding employment relationship until the conditions listed therein were satisfied. These were conditions which, until completed, did not create a binding obligation on the part of Roehl Transport to employ Niday as a driver.

Roehl's argument blurs the line between the formation of a contract and the fulfillment of conditions within an existing contract. *See* Restatement (Second) of Contracts § 224 cmt. c (Am. Law Inst. 1981) ("In order for an event to be a condition, it must qualify a duty under an existing contract.").[9] Our supreme court

---

[9] As further clarification, the American Law Institute reporter noted:

> When an event that is not normally part of the process of formation of contract is made an event upon which the performance of the contract is dependent, courts often describe it as a condition that must be performed

has defined conditions precedent as "those facts and events, occurring *subsequently* to the *making of a valid* contract that must exist or occur before there is a right to immediate performance, before there is a breach of contract duty, before the usual judicial remedies are available." *Nat'l Farmers Org., Inc. v. Lias*, 271 N.W.2d 751, 754 (Iowa 1978) (emphasis added); *accord Yost v. City of Council Bluffs*, 471 N.W.2d 836, 838 (Iowa 1991) ("The City initially attempts to dismiss the allegations raised by Yost in this appeal by contending that no valid and enforceable contract ever existed between the parties. In support of its contention, the City argues that because Yost failed to complete all of the conditions precedent to form the contract, the proposed contract was a nullity. We . . . find this argument to be meritless and conclude that a valid and enforceable contract was in full force at the time of the fire."); *see also State ex rel. Career Aviation Sales, Inc. v. Cohen*, 952 S.W.2d 324, 326–27 (Mo. Ct. App. 1997) ("A condition precedent presupposes the existence of a contract and not the converse . . . . A condition precedent is a condition which must be fulfilled before the duty to perform an existing contract arises. Thus, a condition precedent denotes an event which qualifies a duty under an already enforceable contract. A contract condition which qualifies a duty of performance by a party does not make the existence or validity of the contract hinge on the condition." (internal citations omitted)).

---

before the contract comes into existence. Similarly, inartistically drafted contracts may contain language such as: "this contract shall not come into existence until Event A occurs." . . . [I]t is better to view a contract as already in existence, but with the parties' respective performances subject to the specified event, which is a condition to their respective performances.

Restatement (Second) of Contracts § 224 reporter's note cmt. c (citations omitted).

A contract is made where the last act necessary to form a binding contract occurs. *Terry*, 631 N.W.2d at 266–67. We are persuaded by out-of-state authority that the "last act necessary" means acceptance of an offer rather than fulfillment of conditions.[10] For example, the New Mexico Court of Appeals thoroughly examined the issue before us—"whether [a drug and safety testing requirement contained in employment offer] was a prerequisite to the formation of the underlying contract, or whether the condition was a prerequisite to a future obligation to perform under the contract." *Potter v. Patterson UTI Drilling Co.*, 234 P.3d 104, 109 (N.M. Ct. App. 2010). The New Mexico court concluded the condition "did not affect the formation of the underlying contract"—instead, the testing was a prerequisite to continued performance under the contract—i.e., beginning work. *Id.* at 110.

Likewise, in *General Electric Co. v. Folsom*, the Oklahoma Supreme Court rejected an employer's argument the contract was formed in a different state because the offer of employment was contingent on the claimant passing a driving test and a number of physical exams. 332 P.2d 950, 951–52 (Okla. 1958). The Oklahoma court focused on the undisputed evidence—mailed correspondence from the employer extending an offer of employment and claimant accepting, despite the contingencies contained in the offer. *See id.* The court concluded,

> [W]e think there can be no question that, as a matter of fact and law, it was the intention of both Folsom and his employer that his contract

---

[10] Several jurisdictions have concluded, at least under particular circumstances, that a contract is not formed until the conditions are fulfilled. *See, e.g.*, *Dhermy v. Illinois Workers' Comp. Comm'n*, No. 4-13-0011WC, 2013 WL 5972176, at *4–5 (Ill. Ct. App. Nov. 8, 2013); *Graham v. TSL, Ltd.*, 350 S.W.3d 430, 432–33 (Ky. 2011); *Taylor v. Howard Transp., Inc.*, 771 S.E.2d 835, 839 (N.C. Ct. App. 2015); *Pro Football Inc. v. Paul*, 569 S.E.2d 66, 71 (Va. Ct. App. 2002). But we find the decisions from those courts that distinguish formation from enforceability to be more convincing.

of employment come into being in Oklahoma, and that is the state where it was entered into. . . . When he thereafter met those requirements, even though he did not take, and pass, the company's physical examination until after his arrival in Indiana, the location of his first job assignment, the effective date of his employment related back to, and was coincident with, his acceptance in Oklahoma of said company's offer.

*Id.*; *see also Alexander v. Transp. Distribution Co.*, 954 P.2d 1247, 1250–51 (Okla. Ct. App. 1997) ("[I]t is not the 'final assent' of the employer that establishes the 'place where the contract is made . . .' but the 'final assent' of an Oklahoma resident to an offer of employment." (citation omitted)).

And in *Bowen v. Workers' Compensation Appeals Board*, 86 Cal. Rptr. 2d 95, 103–04 (Ct. App. 1999), the California Court of Appeals concluded a contract of hire was formed when the Florida Marlins farm team drafted a baseball player, communicating the terms of the employment over the phone. *Id.* The team mailed the player a contract so he could sign it, then forwarded it to the commissioner; the contract noted it would not become valid until the commissioner signed it. *Id.* at 97. The California court concluded subsequent formalities did not "abrogate the contract of hire." *Id.* at 100. It continued: "[s]uch things as filling out formal papers regarding the specific terms of employment or obtaining a security clearance from the federal government" did not "prevent the contract from initially coming into existence." *Id.*

Similarly, the Kansas Court of Appeals concluded the "last act necessary" to form a contract of hire was the claimant's acceptance of a company's offer over the phone, despite the requirement the claimant "submit to a pre-employment drug screening and background check" in a different state, as noted in a letter sent by the employer. *Shahane v. Station Casino*, 3 P.3d 551, 554–55 (Kan. Ct. App.

2000). More jurisdictions take the same stance. *See, e.g.*, *Brown v. Travelers Ins. Co.*, 232 S.E.2d 609, 609 (Ga. Ct. App. 1977); *Mattel v. Pittman Constr. Co.*, 180 So. 2d 696, 698 (La. 1965) (finding contract of hire made in Louisiana where union officer told claimant where to report for work and claimant understood terms of work regarding time and wages, despite fact employer could have rejected claimant upon arrival at out-of-state job site); *O'Briant v. Daniel Constr. Co.*, 305 S.E.2d 241, 243 (S.C. 1983) ("The existence of a contract, not the commencement of work, establishes the employer-employee relationship which is the jurisdictional foundation upon which an award is made. . . . The final act which rendered a binding contract in the present case was O'Briant's verbal acceptance over the telephone."); *see also Matthews v. St. Paul Prop. & Liab. Ins.*, 845 S.W.2d 737, 739 (Tenn. 1992) ("[Employer] offered [claimant] a job during the telephone conversation and . . . he accepted that offer. The fact that a written contract was later executed in Missouri memorializing the details of the agreement between the trucking company and its new driver does not affect this finding.").

Roehl overlooks the distinction between formation of a contract and enforceability of a contract. *See H.L. Munn Lumber Co. v. City of Ames*, 176 N.W.2d 813, 816 (Iowa 1970) ("The insertion of a condition precedent in a contract does not render the same void but only delays the enforceability of the contract until the condition precedent has taken place." (quoting *Locke v. Bort*, 103 N.W.2d 555, 558 (Wis. 1960))). Roehl does not argue it was not bound by its promise to employ Niday provided he fulfilled the enumerated conditions. Nor does it dispute Niday's assertion Farvour-Smith offered him a job during their May 10 phone conversation or that Niday accepted the offer during the same conversation. And

Roehl did not present any evidence demonstrating offer or acceptance occurred at a different time or place.

Applying the law to these facts, we conclude Niday and Farvour-Smith struck a bargain in their telephone call. Employment contracts are often oral and informal. *See Parson v. Proctor & Gamble Mfg. Co.*, 514 N.W.2d 891, 893 (Iowa 1994) (noting the frequent lack of formality in contracts for hire). Here, no terms remained to be negotiated following the May 10 letter, which documented Niday's conditions of employment in detail. After Niday accepted Roehl's offer, he informed his current employer of his intent to leave, and Roehl scheduled and funded travel arrangements for his training in Indiana. It would be unusual for Roehl to fund Niday's trip to Indiana and invest in his training absent affirmation from Niday confirming his intent to work for Roehl provided he could meet all requirements. The contract of hire was formed before Niday left Iowa.

Roehl's offer, accepted by Niday, is distinguishable from an agreement to enter into an agreement. *See, e.g.*, *Air Host Cedar Rapids, Inc. v. Cedar Rapids Airport Comm'n*, 464 N.W.2d 450, 452–53 (Iowa 1990) (finding no enforceable contract where terms were indefinite, stating: "It is axiomatic that understandable or ascertainable terms are necessary ingredients for an enforceable contract. A contract generally is not found to exist where the parties agree to a contract on the basis to be settled in the future"). The record shows Roehl intended to be bound by Farvour-Smith's offer to Niday. And Niday "sp[oke] his . . . acceptance" in Iowa. *See Terry*, 631 N.W.2d at 270.

Because the last act necessary to a meeting of the minds—Niday's acceptance of Roehl's offer—occurred in Iowa, he was working under a contract

of hire made in this state. *See id.* at 266–67 (citing 99 C.J.S. *Workers' Compensation* § 72, at 144–45 (2000) ("Where the worker's acceptance of an offer of employment is given by telephone, the place of contracting is where the acceptor speaks his or her acceptance."); Restatement (Second) of Contracts § 64 cmt. c ("To the extent the issue [of where an acceptance takes effect] is referred to the rule governing private contract disputes, . . . the contract is created at the place where the acceptor speaks or otherwise completes his manifestation of assent.")); *see also* Iowa Code § 85.71(1)(b). Because the contract of hire was made in Iowa, and Roehl concedes Niday regularly worked in Iowa, Niday's claim meets the jurisdictional requirements in section 85.71(1)(b). We reverse and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**